JANE TILGHMAN RAMSAY STABLER, MARY MORRIS RAMSAY PHELPS, and CAROLINE RAMSAY CHANDLER,
Appellants,

*vs.*

JOSEPH GALES RAMSAY, ALEXANDRA MORRIS RAMSAY, WILLIAM E. PHELPS, WALTER BLACKSON, Surviving Trustee Under the Will of WILLIAM GOUVERNEUR RAMSAY, Deceased, et al.,
Appellees.

WALTER BLACKSON, Surviving Trustee, et al.,
Appellants,

*vs.*

JOSEPH GALES RAMSAY, et. al.,
Appellees.

*Supreme Court, On Appeal, May 7, 1952.*

TUNNELL, Justice, SEITZ, Chancellor, and CAREY, Judge, sitting.

*William S. Potter* and *James L. Latchum, Jr.,* of the firm of Berl, Potter & Anderson, for Jane Ramsay Stabler, Mary Ramsay Phelps and Caroline Ramsay Chandler, plaintiff-appellants.

*Aaron Finger* and *Alexis I. duPont Bayard,* of the firm of Richards, Layton & Finger, for Walter Blackson, surviving trustee under the will of William G. Ramsay, deceased, and Wilmington Trust Company, surviving trustee for Caroline R. Chandler, and others, defendant-appellants.

*William H. Foulk* and *Herbert L. Cobin,* for Joseph Gales Ramsay and Albert L. Massey, guardian *ad litem* for Alexandra Morris Ramsay, appellees.

TUNNELL, Justice, delivering opinion of the court:

William G. Ramsay, a resident of this state, died on September 28, 1916. He devised his entire residuary estate unto Tilghman Johnson and Walter Blackson as trustees, directing[1] them to pay the income therefrom to the testator's widow, Caroline Johnston Ramsay, during her life, and at her death to pay over the corpus unto the testator's five chil-

---

[1] For a quotation of the actual language of the will reference may be had to the report of this case below, 30 *Del. Ch.* 439, 62 *A.* 2d 464, 466.

dren in equal shares. The will also provided that if any of the said five children should predecease the life tenant, the "issue" of any such deceased child or children would take such deceased parent's share *per stirpes*, but if there were no issue, such share would pass to the children of the testator who did survive or leave issue, as the case might be.

In 1926 the four daughters of William G. Ramsay, whose present names are Jane Tilghman Ramsay Stabler, Mary Morris Ramsay Phelps, Caroline Ramsay Chandler, and Elizabeth Ramsay Ferris, entered into similar trust agreements, under the terms of which each of them singly purported to assign, transfer, and set over unto Wilmington Trust Company and Tilghman Johnson, trustees, certain interests in her father's estate. We are here especially interested in the following language which appeared in each of the four said assignments:

"Whereas, the parties hereto desire to create a trust of the estate and properties and for the purposes hereinafter named, and

"Whereas, the said Trustor is entitled, under the Will of her father, William G. Ramsay, dated July 2d, 1910, and recorded in the Office of the Register of Wills at Wilmington, Delaware, to a vested remainder or share in a Trust Estate created under said Will, to take effect after the death of her mother, Caroline Johnston Ramsay, as evidenced inter alia by the following clauses of said Will:

" 'To pay the whole of the net income derived from the trust estate as and when received to my wife, Caroline Johnston Ramsay, during the term of her natural life; upon the death of my said wife, I give, devise and bequeath all of the Trust Estate to my children, Caroline Johnston Ramsay, Elizabeth Gouverneur Morris Ramsay, Joseph Gales Ramsay, Mary Morris Ramsay, and Jane Tilghman Ramsay, absolutely share and share alike.'

"Now, Therefore, in consideration of the premises and in further consideration of the sum of One Dollar ($1.) paid by Trustor to Trustee at and before the sealing and delivery hereof, the receipt whereof is hereby acknowledged, Trustor hath assigned, transferred, and set over, and by these presents doth hereby assign, transfer and set over, unto the said Trustees, their Executors, Administrators, Successors and Assigns, all her right, title, interests, claim, demand and share in said Trust Estate, devised and bequeathed to her as aforesaid:

"To have and to hold the said estate, securities and cash, to which said Trustor is entitled after the death of her mother, when and as received * * *."

In 1946 Joseph Ramsay, the son, who had no children of his own, but had adopted a child, Alexandra Morris Ramsay, became alarmed as to his health and fearful that if he should die before his mother, his adopted daughter might receive nothing from the estate of his father, William G. Ramsay, because she might not be deemed in law to be his "issue," as that term was used in his father's will. Accordingly, at the request of Joseph, relayed to the sisters through the agency of Joseph's wife, three of the four sisters, namely, Jane, Mary, and Caroline, were prevailed upon to execute an agreement stating in substance that if Joseph should predecease their mother, then Alexandra, Joseph's adopted daughter, should inherit any share of the estate which she would have been entitled to receive had she been Joseph's natural, legitimate child. This agreement of 1946 recited that it was entered into in consideration of love and affection "and in settlement of any legal question which may arise on the death of the said Joseph Gales Ramsay." In it the names of all four sisters appeared in the introductory language, where the parties to it were listed, and at the conclusion of the instrument places were provided for the signatures of all four. Elizabeth Ferris, however, refused to sign, taking the position that in 1926 she had already assigned to trustees whatever rights she had in her father's estate.

In this factual situation the three sisters who did sign the 1946 agreement filed a complaint in the Court of Chancery reciting all the matter above recounted and additionally alleging that there had been a distinct understanding, verbally reached prior to the execution of the 1946 agreement, that it was not to bind any of the signatories unless all four sisters should sign. The complaint, therefore, as ultimately amended, prayed for a declaratory judgment holding:

(1)[2] That the assignments of 1926 had conveyed unto the trustees therein named the entire interest of the assignors in the estate of William G. Ramsay, deceased, so that after the said assignments were executed, the sisters had no interest in the said estate which they could subject to any further assignment or conveyance.

(2) That the agreement of 1946, purporting to assign to Alexandra Morris Ramsay an interest in remainder in the estate created by the second item of the will of William G. Ramsay, deceased, was "ineffectual."

All parties who answered the complaint joined in the prayer that the Court of Chancery entertain the action. It did so. It took testimony, heard argument, and in due course entered a declaratory judgment. From the language of the judgment and from the opinion on which it was based, it appears that the then Chancellor held that the will of William G. Ramsay had provided each of the children with two types of interests: (1), a defeasible vested remainder in an undivided one-fifth of the estate, and (2), an executory devise providing a possibility of inheriting through the contingency that one or more of the testator's five children might die without issue prior to the death of the life tenant. The assignments of 1926, he went on to hold, were not defined by the all-inclusive language of their granting clauses; they were limited by the language of their respective second recitals, so that they applied only to the "vested remainders" of the assignors. The executory devises, he held, remained unassigned after 1926. The agreement of 1946, moreover, which was signed by only three sisters, was not dependent for its validity upon being signed by all four, but was duly and unconditionally delivered, operating severally to convey the executory devises of the three sisters who executed it.

---

[2] We have inverted the order of these two prayers as they appeared in the complaint and elected to consider them in the same order followed by the lower court and by counsel in our court.

From this judgment the plaintiffs and the trustees under the 1926 agreements both appealed.

When the appeals came on for argument, this court raised, and obtained the assistance of counsel on, the question whether under the facts as hereinabove related, we have before us an "actual controversy" within the meaning of our Declaratory Judgments Act, *Chap.* 269, *Vol.* 46, *Laws of Delaware.* The first sentence of the statute, which states a prerequisite to all action under its terms, begins, "In cases of actual controversy * * * the Court of Chancery * * * shall have power * * *." This inquiry from the court was prompted by the fact that there will be no basis for any controversy of any kind about the disposition of Joseph Ramsay's one-fifth interest unless he happens to die without issue before his mother dies, and even if that happens, these plaintiffs will have no rights to assert unless they survive the life tenant. Thus, some aspects of the problem here presented are not merely anticipatory of the future, but may never become actual issues at all. And if certain events occur to make them actual issues, the present alignment of parties will be the wrong one unless a certain pattern of other facts prevails at that time. Therefore, while we have here a difference of opinion as to the effect of certain legal instruments, there is a serious question as to whether it is to be deemed an "actual controversy" as those words are used in the statute. Obviously, in view of the statutory language quoted above, this inquiry is jurisdictional in its character, and presents an issue which the court itself was bound to raise. That all parties consented to jurisdiction is immaterial. *Philadelphia Manufacturers Mutual Fire Ins. Co. v. Rose,* 364 *Pa.* 15, 70 *A.2d* 316.

This expression, "actual controversy," used in our Declaratory Judgments Act, also appears in the Federal Act.[3] It does not appear in the Uniform Act.[4] There is a remark-

---

[3] *Title* 28 *U. S. C.* § 2201.

[4] *Vol.* 9, *U. L. A.* 234.

able unanimity of opinion as to the application of all the acts, however, and in few, if any, cases has the decision actually turned on the use of the specific words, "actual controversy." Moreover, in those courts where a difference in the statutes is said to exist, our statute and the federal one are necessarily considered more selective than the Uniform Act, rather than less so. Decisions under the Uniform Act that a given cause is not justifiable are, thefore, *a fortiori* cases.

Let us first consider whether the Court of Chancery was within its jurisdiction in undertaking a general declaration of the rights of the parties under the assignments of 1926. The precise question, as put to us by plaintiff-appellants, is whether under these assignments the entire interests of plaintiffs passed to the trustees, or whether only the respective one-fifth vested interests passed, and the so-called contingent interests, or any interests of any nature, remained in plaintiffs.[5] The defendant-appellants, on the other hand, argue that all interests here involved are properly termed "vested," and, therefore, that whatever interests were owned by the assignors passed by the 1926 assignments. Leaving aside any differences among the parties as to classification or terminology, however, all admit, as they must, that we are here concerned only with the interest which we may refer to as Joseph's share.

Nobody contends that this first question, concerning the effect of the 1926 assignments upon the rights of other people in Joseph's share, could be litigated under the old forms of practice. Plaintiffs do not claim any present right to possession of, or income from, the property, nor do they claim that any injury to it is imminent. Further, as was stated above, unless Joseph should predecease his mother

---

[5] This whole question could possibly be treated as relevant only in so far as it bears upon the 1946 agreement. The language of the complaint, however, is not thus restricted, nor was the judgment of the court below. We have, therefore, felt bound to consider it first as an independent problem and then as one related to the 1946 transaction.

leaving no issue, the one-fifth interest here involved will upon his mother's death become his absolute property, subject to whatever disposition he may see fit to make of it. Under the conventional practice, therefore, the courts would be compelled to direct the parties to await the developments of the future.

Even in the declaratory judgment procedure, where the principal reason for its invention was to enable the law of a case to be determined before mere differences ripen into actual injuries, the authorities appear to be unanimous that the courts will not ordinarily grapple with problems which there is any real likelihood that they may never have to settle. Courts agree that they will not be drawn into the giving of mere advisory opinions, and they insist upon being shown the necessity for taking jurisdiction. They must, in short, be convinced that litigation sooner or later appears to be unavoidable before they will intervene. 16 *Am.Jur.*, *p.* 284; 1 *C.J.S.*, *Actions*, § 18, *p.* 1030; 9 *U.L.A.*, *p.* 258.

But, although the foregoing is unquestionably the general rule, sometimes, in harmony with the spirit of the declaratory judgment remedy, the courts have found it necessary to seize time by the forelock and define rights which are not yet in plaintiff's possession, but are only future or contingent. It is said that this course may be taken wherever the settlement of present rights entails the settlement of future or contingent ones, or wherever the court finds, in the exercise of a sound judicial discretion, that there are "special circumstances" which make that course desirable. See 16 *Am.Jur.*, 293; *Anderson, Declaratory Judgments*, 169; 1 *C.J.S.*, *Actions*, § 18, *p.* 1030, and collection of authorities in 174 *A.L.R.*, 882.

While there is no indication that there was any discussion of this jurisdictional question below, when it was raised in this court, counsel argued that the question ought to be settled now in order to "save time" and provide for an or-

derly settlement among the parties in case it should happen that Joseph should die without issue during his mother's life. Such an allegation is incorporated in the separate answers of the defendant-appellants and of Robert H. Guilford, guardian *ad litem* for certain minors. But to us that seems no compelling circumstance at all. The same test, if generally applied, would let in all hypothetical cases, and, under the guise of saving time, would result in the unnecessary consumption of an incalculable amount of the time of courts and litigants alike.

Nor was the alignment of parties such as to cause the court's error in disregarding this requirement of special circumstances to be non-reversible. As was pointed out above, the plaintiffs may not be the claimants of the rights for which they here contend when and if future events give a claim for Joseph's share to anybody other than Joseph. In a case where in the original litigation the court had not only failed to touch upon the question of special circumstances, but where the record seemed to be bare of any facts which could be considered as such, Sir George Jessel, Master of the Rolls, nevertheless, declined to permit disturbance of the decree of the Vice-Chancellor, stating his views in these often-quoted words:[6]

"Now it is true that it is not the practice of the court, and was not the practice of the Court of Chancery, to decide as to future rights, but to wait until the event has happened, unless a present right depends on the decisions, or there are some other special circumstances to satisfy the court that it is desirable at once to decide on the future rights. But where all the parties who in any event will be entitled to the property are of age and are ready to argue the case, the reason of the rule departs, and it becomes a bare technicality. The reason of the rule is this, that the court will not decide on future rights, because until the event happens it does not know who may be interested in arguing the question, and therefore may be shutting out parties who, when the event happens, may be entitled to succeed, but where they are all of age, and every possible party is represented before the

---

[6] *Curtis v. Sheffield*, 21 *Ch. D.* 1(4).

Court, as I said before, utility seems to say that there should be a power to determine their rights, * * *."

While the present issue of plaintiffs may all have been joined as parties to this cause, no one can now know, of course, who the plaintiffs' issue will be at some future time. Certainly no judgment here entered can bind the interests of parties who are not joined. Yet, when this prospect of a future controversy ripens into a present one, the issue of the plaintiffs may actually be the parties in interest. In the absence of any facts which could be regarded as special, compelling circumstances, as we have found to be the case, this deficiency in respect to parties is dispositive of the matter. See *Anderson, Declaratory Judgments, p.* 175; *Borchard, Declaratory Judgments (2d Ed.) p.* 258.

Finally, the interests of the respective parties on the immediate question are not adverse. The only parties to the 1926 assignments were the plaintiff-appellants, on the one hand, and the defendant-appellants, on the other hand. In order to have an actual controversy, it is elementary that adverse interests must be involved. *Borchard, Declaratory Judgments (2d Ed.) p.* 29. But there is no such adverse interest here. On the contrary, plaintiffs insist that they have already assigned their entire interests in the estate to the trustees. Such is their desire. Even if they mistrust the 1926 assignments, they are alive and capable of executing unquestionable assignments, assuming, of course, that the owners of these anticipated interests are determined with sufficient certainty to render the interests susceptible of any assignment at all, a question which we do not decide. We are bearing in mind that the principal purpose of the declaratory judgment procedure is to promote preventive justice, and, accordingly, that the statute is entitled to a liberal application, but there is simply no basis upon which to rest a discretionary finding that there is an actual controversy under the 1926 assignments, and we are clear that no declaratory judgment of any character should have been entered in re-

spect to it unless it was necessary to the decision of some other issue which was properly before the court.

Now let us turn to the question of jurisdiction to consider the 1946 agreement. Much of what we have said of the difficulties as to the joinder of parties in a general declaration of rights under the 1926 assignments also applies to any attempt to hark back to these same assignments in relation to their bearing upon the 1946 transaction. We are still confronted by the important fact that we do not know who will be the parties having genuine interests when and if the cause of action ripens into an actual controversy.

But one aspect of the 1946 agreement, the narrow question of whether it was delivered or not, is on a different footing. If the issue of delivery be regarded as presently ripe for adjudication, as it may well be, there is, of course, no problem of jurisdiction. If, on the other hand, the position be taken that the question of delivery has no significance of its own, and has importance only by reason of its effect upon rights which are essentially future or contingent, and, therefore, that calling the question an immediate one is simply a subterfuge to side-step the difficulties we have previously encountered, the answer must still be that the court below had jurisdiction.

As to the 1946 contract, in contrast with the 1926 assignments, counsel were able to point to some facts in the record which could be regarded as "special circumstances" militating for a declaration of future and contingent rights. They urged that plaintiffs have a right to know whether they or Alexandra own the *res* to which the 1946 agreement relates. And in behalf of Joseph and Alexandra, it was urged that they also have a right to know whether Alexandra enjoys the security which this interest would represent, or whether it will be necessary for Joseph or somebody else interested in Alexandra's welfare to make alternative provision for her education and support.

If it were necessary for us to approach this

problem as in the first instance, and decide in our own behalf whether these facts constitute such special and compelling circumstances as must form the basis for taking jurisdiction under the Declaratory Judgments Act to settle future rights uncertain to accrue, our decision might be seriously difficult. But the question is not put to us in that form. As an appellate court our only function is to determine whether the Chancellor's entertainment of the action was or was not an abuse of discretion. 16 *Am.Jur.* 287; *Cutting v. Bryan,* 206 *Cal.* 254, 274 *P.* 326, *certiorari denied* 280 *U.S.* 556, 50 *S.Ct.* 16, 74 *L.Ed.* 611. We find that it was not.

We must, therefore, now determine whether or not the 1946 contract was of such character that it required execution by all the sisters, as the complaint alleges, before it could become binding upon any.

This contract concerned a family arrangement. It is clear from the language of the instrument that the intent was to cause Alexandra to be treated as if she were born to Joseph. It represented an effort to put her upon an equal basis with the other four branches of the family. If she takes any interest, therefore, it could be no less than a one-fifth interest. There can be no doubt on the point, for the body of the agreement states:

> "Now This Agreement Witnesseth, that the parties hereto in consideration of the mutual love and affection and in settlement of any legal question which may arise on the death of the said Joseph Gales Ramsay, prior to the death of his said mother, and intending to be legally bound, hereby agree that should the said Joseph Gales Ramsay predecease his said mother, Caroline Johnston Ramsay, then and in that event the adopted child of the said Joseph Gales Ramsay, to wit, Alexandra Morris Ramsay, shall have the right to receive, and shall receive, any share under the will of the said William Gouverneur Ramsay to which the said Alexandra Morris Ramsay would have been entitled to receive and receive (*sic*) if the said Alexandra Morris Ramsay had been a natural legitimate child of the said Joseph Gales Ramsay."

Now it was held below that the undertakings of plaintiffs were several in their character and, consequently, that

the agreement bound each signer whether anybody else signed or not. If that be a sound conclusion, in view of the plain language above quoted from the contract, obviously the several signers must deliver Alexandra her one-fifth,[7] whether or not anybody else assists in providing it.

Let us examine the consequences of such an interpretation. We have seen that if Alexandra is entitled to anything, she is entitled to at least one-fifth. Elizabeth did not sign, so in the event of Joseph's death without issue, she would get her one-fifth, plus one-fourth of Joseph's share, or, altogether, one-fourth of the estate. That would leave plaintiffs to divide among the three of them eleven-twentieths. But eleven-sixtieths, which in that event would be each plaintiff's share, is a smaller fraction than one-fifth. Hence, under the lower court's interpretation, Elizabeth's failure to sign actually caused the ones who did sign to reserve for themselves smaller interests than the contract contemplated. We may use a harsher example by supposing that only one sister had signed. She would in such a case deliver Alexandra one-fifth of the estate and take only one-twentieth for herself. Without doubt the court lacked the power to enforce a contract thus differing from the agreement of the parties. It could not enforce a contract *cy pres*.

Nor does it make any difference that Alexandra's counsel, perceiving the impasse confronting them, have seen fit to claim for Alexandra enough less than the one-fifth assigned to her[8] to save the rights of plaintiffs from encroachment, thus adroitly effecting a kind of camouflage over the fatal defect in Alexandra's position. To embark upon this sort of revision of the important clauses of a contract according to our own notions of equity would be to cast loose

---

[7] Conceivably one-fourth, one-third, or a larger interest, of course, depending upon the possibility of deaths of daughters of William G. Ramsay without issue during the life of his widow.

[8] Not demanding, according to the contract, the entire interest Alexandra would have taken if she had been Joseph's daughter, but only the interest of each plaintiff in Joseph's share.

altogether from such restraints as make our system of justice an orderly pattern. And it is no more within our power to re-write the contract at somebody's expense when we have a volunteer for diminution than it would be if each party insisted upon her full contractual rights. In our view of the matter, therefore, there was such a frustration of the agreement when Elizabeth declined to join in it that it amounted to a total failure of consideration, and the contract never went into force. *Williston on Contracts, (Revised Edition), Vol.* 6, *Sec.* 1954.

Cases precisely in point are *Peto v. Peto,* 16 *Sim.* 589, 60 *Eng.Rep.* 1003, and *Bolitho v. Hollyar,* 34 *Beav.* 179, 55 *Eng.Rep.* 603. Also see *Morton v. Morton,* 1 *Ch. Div.* (1932) 505.

The authorities cited by the court below are not apposite. The case of *Deputy & Co. v. Hastings, Admr.,* 2 *W.W. Harr.* 345, 123 *A.* 33, the Delaware decision cited by the Chancellor, involved a contract executed by several tenants in common of a tract of timber for the sale of certain lumber to be cut from the tract. One proposed signer, however, refused to execute the papers. Thereupon, all sellers who had signed attempted to extricate themselves from the contract. In the *Deputy* case, in common with all other authorities cited below, there was nothing in the terms of the agreement indicating that the size of the interest of any signer would be increased or diminished by the circumstance that any other party would sign or refuse to sign. If the signers appeared to promise to sell lumber cut from timber they did not altogether own at the time of signing, it was also true that they were to be paid the entire purchase price of property which in part belonged to another. In that case, therefore, any intention to deliver conditionally, if there was such intention, had to be demonstrated by proof of some agreement outside the written contract, while in our case the reservation not to be bound is deducible from the terms of the instrument itself. Our findings here are in complete accord with the principles of law laid down in Judge Rodney's

charge to the jury in the *Deputy* case. The facts alone are different.

In view of the foregoing paragraphs, there is no necessity for express consideration of the question of admissibility of the evidence as to an alleged oral agreement of conditional delivery. The only evidence offered on the point was in support of the theory of conditional delivery and, therefore, tended to sustain the same conclusion reached by analysis of the terms of the agreement.

The judgment will be reversed in so far as it applies to the 1946 agreement and stricken in so far as it applies to other matters. The cause will be remanded to the Court of Chancery for entry of a new judgment affirmatively declaring the rights of the parties in accordance with this opinion.

A special form of mandate may be submitted.