SCHICK INCORPORATED, Plaintiff,

v.

AMALGAMATED CLOTHING AND
TEXTILE WORKERS UNION,
Defendant.

Civ. A. No. 9066.

Court of Chancery of Delaware,
New Castle County.

Submitted: July 31, 1987.
Decided: Sept. 16, 1987.

Paul P. Welsh, and Palmer L. Whisenant
of Morris, Nichols, Arsht & Tunnell, Wil-
mington, and John J. Walsh, Louis Bevilac-
qua, and Michael G. Dolan of Cadwalader,

Wickersham & Taft, New York City, of counsel, for plaintiff.

Allen M. Terrell, Jr., and Nathan B. Ploener of Richards, Layton & Finger, Wilmington, and Eric Seiler, and Robert D. Kaplan of Friedman & Kaplan, New York City, of counsel, for defendant.

## OPINION

ALLEN, Chancellor.

The innovative complaint in this declaratory judgment action has been challenged as failing to state a claim upon which relief may be granted. I pass immediately therefore to a description of the facts as alleged in that pleading.

## I.

Plaintiff ("Schick" or "the Company") is a Delaware corporation that owns a diversified group of subsidiaries including Reeves Brothers, Inc. Reeves, which was acquired by Schick in May 1986, operates two polyurethane foam manufacturing plants in Cornelius, North Carolina.

Defendant Amalgamated Clothing and Textile Workers Union ("ACTWU" or "the Union") is an unincorporated labor organization with its headquarters in New York City. ACTWU was chosen in early 1986 as the collective bargaining agent for about 650 persons employed in Reeves' North Carolina plants. Reeves and the Union have failed to reach agreement on an initial collective bargaining agreement. Negotiations have been intense and sometimes heated.

Over the past several months, the ACTWU has taken a series of coordinated steps to bring pressure upon Schick and Reeves to reach a collective bargaining agreement acceptable to the Union. To that end, it is alleged (and, for purposes of this motion, I assume all well-pleaded allegations to be true) that ACTWU has taken the following actions:

(1) it has caused union members to stage unauthorized work stoppages and slow downs;

(2) it has caused Reeves products to be sabotaged; non-union employees to be harassed and their personal property damaged;

(3) it has caused its members to picket several of Schick's lending institutions and its investment banker;

(4) it has written to debenture holders of a Schick subsidiary, Newreeveco, Inc., claiming that Schick omitted unspecified material information from offering documents.

In early 1987, allegedly as part of a campaign to harass Schick and not for any investment purpose, the Union acquired 71 shares of Schick common stock. It then transferred one share each to 20 individual union members.

By letter dated May 15, 1987 the Union demanded that the board of directors of Schick bring suit on behalf of the Company to rescind various transactions between the Company and James W. Hart. Hart owns (directly or otherwise) 92% of the common stock of Schick, is the Chairman of the Board and Chief Operating Officer of the Company. The demand letter identifies five transactions between Mr. Hart (or entities he controls) and Schick which allegedly constitute waste of Company assets or other breaches of fiduciary duty by Mr. Hart.

In its demand letter, ACTWU claimed that the Company's board had wasted corporate assets in granting to Mr. Hart an option to purchase 1,050,000 shares of Schick common stock at an exercise price of $1.97 per share. ACTWU also asserted that Hart engaged in self-dealing in several transactions, which it implied were either unfair to Schick or which constituted gross waste. The transactions complained of included the leasing of office space by the Company from a Hart-controlled entity (at an annual rent of $365,000), the leasing of a beach house from Hart (at an annual rent of $135,000), the leasing of computer and word-processing systems, and the leasing of five luxury automobiles all allegedly from Hart or entities controlled by Hart. ACTWU demanded that the board direct Schick's attorneys to bring suit to set aside the stock option, recover any stock issued to Hart, and rescind the lease agreements. In its message to Schick's board, ACTWU

indicated that it intended to initiate a derivative suit if the board did not make a "satisfactory response" within 30 days.

The board's reaction to the Union's demand was to authorize the filing of this lawsuit. It alleges that the demand letter is part of a campaign "of coercive actions and harassment ... designed to force Schick to cause Reeves to enter into a collective bargaining agreement ... unfavorable to Reeves, Schick and Schick's stockholders. That is the Demand Letter's sole purpose....ACTWU has no real investment or stockholder interests; its only real interests and motives are in direct conflict with those of Schick and its shareholders. Consequently, the ACTWU cannot fairly and adequately represent Schick's shareholders in any derivative or class action." Complaint ¶ 7.

Moreover, it is alleged that, "[i]f Schick's Board of Directors were required to respond to the ACTWU's Demand Letter as if it were legitimate ... the ACTWU's coercive, harassing tactics [would] be legitimized ... [and] would have their intended and illegitimate effect—Schick ... and its officers and directors would be required to devote time, energy and expense to the review and analysis of the ACTWU's accusations and demands." Complaint ¶ 8.

The complaint seeks a declaratory judgment that (a) the Union is not a proper representative of Schick's shareholders for purposes of bringing derivative or class actions and that (b) the Union is not entitled to demand that the board respond to its demand letter. The complaint also seeks an implementing injunction permanently restraining ACTWU and those acting in concert with it from filing a derivative or class action on behalf of Schick or its stockholders.

## II.

The ACTWU has responded to the filing of this litigation with the pending motion to dismiss. It argues that the litigation is essentially a device to get a premature ruling on Schick's contention that the Union would not be a proper party to bring a derivative action that has not yet been filed. There is no "ripe" controversy as yet concerning the Union's standing to litigate these claims, it is said, and should such a controversy come into being, the court asked to entertain the derivative claim can then decide this preliminary aspect of it. Meanwhile, ACTWU argues, any lack of certainty Schick may feel concerning the Union's disability to act as a representative plaintiff is, itself, without practical consequences. Finally, ACTWU argues that it would be an unfortunate development, both from the point of view of judicial economy and from the vantage of one concerned with the utility of the derivative form of action, to recognize a right of action—even a declaratory judgment action—by a corporation against a shareholder who exercises a right to make a demand under Rule 23.1. To do so, it is said, will necessarily tend to chill the exercise of stockholder rights.

Plaintiff claims this dispute is ripe. First, the Union has, in its demand letter, clearly expressed its intention to bring the underlying claims to litigation. For that reason alone, the Company should be able now to assert a defense, albeit one that would be in the nature of a plea in abatement, that, if valid, would terminate that litigation. Secondly, the Company argues that there is a practical need to have this question of the Union's qualification to sue derivatively decided now because its board, having been confronted with the demand letter, must now act, or refuse to act, with respect to it.

## III.

■ A comparatively recent innovation in Anglo–American law,[1] the declaratory judgment action is designed "to promote

1. While continental systems have long recognized a form of legal action for the non-executory declaration of lawful status or legal rights, the declaratory judgment action as a distinct form of action under Anglo–American law finds its genesis no earlier than a series of three English acts passed in the 1850s which were narrowly construed. The form of action received its first full expression in English Supreme Court Rules adopted in 1883. *See* Borchard *Declaratory Judgments* (2d ed. 1941) at pp. 128–131 and at pp. 215–221. In the U.S., recog-

preventive justice." *Stabler v. Ramsay,* Del.Supr., 88 A.2d 546 (1952). The notion laying behind the innovation is that legitimate legal interests are sometimes cast into doubt by the assertion of adverse claims and that, when this occurs, a party who suffers practical consequences ought not to be required to wait upon his adversary for a judicial resolution that will settle the matter. *See Diebold Computer Leasing, Inc. v. Commercial Credit Corp.,* Del. Supr., 267 A.2d 586 (1970). Born out of practical concerns, the availability of the remedy in any particular case involves the exercise of judicial discretion[2] which should turn importantly upon a practical evaluation of the circumstances present. This discretion should be liberally exercised so that the remedial purpose of the act may be well served. 10 *Del.C.* § 6512.

In 1981 Delaware amended its Declaratory Judgment Act by adopting the Uniform Act. The introduction of that amendment was at the instigation of the Delaware Commissioners on Uniform State Laws. The purpose of adopting the Uniform Act in 1981 was not to change any particular result under the earlier statute (although whether that may at some point be held to be a consequence remains to be seen, *see Heathergreen Commons Condominium Assoc. v. Paul,* Del.Ch., 503 A.2d 636, 641 (1985)) but rather to make available to Delaware courts and litigants the massive body of case law decided under that Act.

*See* 12 *Uniform Laws Annot.* pp. 111–605 (1975). Our Supreme Court, in construing the predecessor of the present version of the Declaratory Judgment statute, has identified the prerequisites of a controversy that are necessary to invoke declaratory judgment jurisdiction. These criteria remain relevant, in my opinion, under the Uniform Act.

We approve the prerequisites of an "actual controversy" spelled out in *Marshall v. Hill,* 8 Terry 478, 481, 93 A.2d 524, 525 (Del.Super.1952): (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.

*Rollins International, Inc. v. International Hydronics Corp.,* Del.Supr., 303 A.2d 660 (1973).

I pass immediately to a discussion of the "ripeness" of this matter for it is in terms of ripeness that the moving party casts it argument.

## IV.

A number of important concerns have led courts in this country, both federal and

---

nition of such an action started in a few jurisdictions in the late 19th century, but the development of the form of action is largely a twentieth century phenomenon spurred on by influential academic writing. *See, e.g.* Sunderland *The Declaratory Judgment—A Modern Evolution in Remedial Rights* 16 Mich.L.Rev. 69 (1917); Borchard *The Declaratory Judgment—A Needed Procedural Reform* 28 Yale L.J. 1 (1918). In 1922, the Conference of Commissioners on Uniform State Laws adopted the first Uniform Declaratory Judgment Act and, by 1939, some forty American states and territories had adopted a statute providing for declaratory relief. *See* Borchard *Declaratory Judgments* (2d ed. 1941) at 132–136. In 1934 the federal act, 28 U.S.C. § 2201, was signed into law. The first Delaware Declaratory Judgment Act was enacted in 1947. *See* 46 *Del.L.* Ch. 269 § 1. In 1981, Delaware adopted the Uniform Act largely in the form originally promulgated in 1922. *See* 63 *Del.L.* Ch. 63 § 1 *et seq.*

2. The determination that a dispute has or has not yet reached a point at which it is appropriate for judicial determination inevitably involves an element of judgment and, therefore, it has been said that the acceptance of declaratory judgment jurisdiction is itself discretionary to that extent. *See Brillhart v. Excess Insurance Co. of America,* 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942) (federal act); *Brohawn v. Transamerica Insurance Co.,* Md.App., 276 Md. 396, 347 A.2d 842 (1975); *Sim v. Comiskey,* Neb.Supr., 216 Neb. 83, 341 N.W.2d 611 (1983); *Ronken v. Board of County Commissioners,* Wash.Supr., 89 Wash.2d 304, 572 P.2d 1 (1977); *Bress v. L.F. Dommerich & Co., Inc.,* N.J.Super., 94 Pa.Super. 282, 228 A.2d 82 (1967); *Greenberg v. Blumberg,* Pa.Supr., 416 Pa. 226, 206 A.2d 16 (1965) (all arising under the Uniform Declaratory Judgment Act). *See* 10 *Del.C.* § 6506.

state, to decline to exercise arguable jurisdiction in instances in which a controversy is deemed to have not yet matured to a point at which judicial action is appropriate. The central concern is to avoid hypothetical questions. Two general reasons underlie this concern. First, judicial resources are limited and must not be squandered on disagreements that have no significant current impact and may never ripen into legal actions seeking coercive relief. Second, to the extent that the judicial branch contributes to law creation in our legal system, it legitimately does so interstitially and because it is required to do so by reason of specific facts that necessitate a judicial judgment. To address a matter before the facts surrounding the dispute are fully developed necessarily not only increases the risk of an incorrect judgment in the particular case, but risks, as well, an inappropriate or unnecessary step in the incremental law building process itself. *See generally* 13A Wright, Miller & Cooper, *Federal Practice and Procedure* § 3532 (1984).

These valid concerns, of course, run counter to some extent to the thrust of the declaratory judgment act itself which promotes greater use of judicial resources and advances the stage at which some disputes will be subject to litigation. Thus, in holding that a controversy that is properly the subject of a declaratory judgment action is one that is "ripe for judicial determination," our Supreme Court has directed our attention to these counter-balancing concerns and has directed the trial courts to attempt to weigh and evaluate each policy by determining whether a disagreement has ripened to the point of supporting declaratory judgment jurisdiction. A practical judgment is required. One federal appeals court has put the matter succinctly and well:

> The law of ripeness, once a tangle of special rules and legalistic distinctions, is now very much a matter of common

sense.... What is required is that the interests of the court ... in postponing review until the question arises in some more concrete and final form, be outweighed by the interests of those who seek relief from the challenged action's immediate and practical impact upon them.

*Continental Air Lines, Inc. v. C.A.B.,* 522 F.2d 107, 124–125 (D.C.Cir.1975).

 Thus, in deciding whether a particular declaratory judgment action is ripe for judicial determination, a practical evaluation of the legitimate interest of the plaintiff in a prompt resolution of the question presented and the hardship that further delay may threaten is a major concern. Other necessary considerations include the prospect of future factual development that might affect the determination to be made;[3] the need to conserve scarce resources; and a due respect for identifiable policies of the law touching upon the subject matter of the dispute.

The first step in this process of practical evaluation is the identification of the legal question sought to be determined. In most instances, this will be self-evident; here, however, it is not quite so readily apparent. This complaint is unusual in that the issue tendered for declaratory determination is *not* the claim that the defendant asserts against the declaratory plaintiff, as it ordinarily will be or even an affirmative defense to such claim. In the typical declaratory judgment action, *see, e.g., Heathergreen Commons Condominium Assoc. v. Paul,* Del.Ch., 503 A.2d 636 (1985), an unwilling litigant will have cast a cloud upon a property right (or other legal interest) of the declaratory plaintiff, but will not have moved forward to litigate the claim. In this standard situation, the declaratory judgment form of action will, in the vivid phrase of Justice Tunnell, permit "the courts ... to seize time by the forelock,"

**3.** Analogously, it is not infrequently held that a summary judgment will be denied even though the court cannot identify a specific material fact in dispute, so that the legal question presented may be assessed in the more highly textured factual setting of a trial. *See, e.g., Kennedy v.*

*Silas Mason Co.,* 334 U.S. 249, 256–257, 68 S.Ct. 1031, 1034, 92 L.Ed. 1347 (1948). Similar reservations about addressing legal questions as abstract propositions would, *a fortiori,* be understandable where the action itself is declaratory in nature and challenged on ripeness grounds.

*Stabler v. Ramsay*, 88 A.2d at 550, and resolve the merits of the claim.

Here, however, there is no attempt to resolve the merits of the claims that the Union, through its demand letter, raises. Rather, relying on the law that holds that in order to be qualified to assert a claim on behalf of a corporation, a stockholder must not have a material conflicting interest,[4] the Company seeks determination now of two related legal contentions. First, it seeks a declaratory judgment that ACT-WU, *qua* Schick shareholder, is *"not entitled to demand* that the Schick board of directors respond" to its May 15th letter. Second, it seeks now a determination that the Union would be disqualified to bring any derivative suit of the kind it threatens to commence. Although these contentions are, of course, closely interrelated, for purposes of declaratory judgment jurisdiction they are importantly different because the first purports to be a problem currently faced by the Company's board while the second clearly relates to a future contingency. Each of these two aspects of the complaint will be taken up in turn.

### A.

■ It is difficult to know what to make of a request for a declaratory judgment to the effect that the Union is not entitled to make a demand of the kind made in its letter of May 15th, *if* that request is meant to ask for something different from the request that the court determine now that the Union will, *in futuro* be an unfit party to litigate a derivative claim on behalf of Schick. In our way of speaking of these things, we do not ordinarily speak of one's entitlement to make a demand of any sort; demands are simply made and, once they are made, the question is not whether one was entitled to make the demand, but whether there is a legal obligation to comply with it. Thus, the most sensible way to

interpret this request for declaratory relief is as a request for a determination that the board has no legal obligation to comply with the demand contained in the May 15th letter. But, so interpreted, in my opinion, the complaint fails to state a claim, without regard to ripeness questions. I so conclude for the following reasons.

■ The "demand" contemplated by Rule 23.1 is really a form of notice designed to afford to the corporation's board an opportunity to consider the facts asserted and to exercise its business judgment whether to press any arguable claim the corporation may possess or to take other action. *Zapata Corporation v. Maldonado*, Del.Supr., 430 A.2d 779 (1981). The board has no obligation to take any specific type of action to comply with a demand under Rule 23.1. The board may, for example, ignore the demand, or it may take other action it deems appropriate if, in the exercise of its good faith judgment the circumstances indicate that the corporation's interests would be served thereby. But, because a Rule 23.1 demand serves a notice function, it makes little difference with respect to the board's duty, upon receiving information of the kind contained in the Union's letter, whether the information comes from a stockholder or from another and thus it makes little sense to think in terms of "entitlement to make a demand."

■ Information of the kind contained in a Rule 23.1 "demand" may have myriad relevant characteristics. It may be either new or already known to the board; it may be true or false; it may come from a credible source or not; it may appear pertinent to some corporate interest or irrelevant, etc. Each of these attributes of information will have a bearing on how a board decides, in the exercise of its business judgment, to react to a Rule 23.1 demand. What is *not* a relevant characteristic of information in this setting is whether the

---

4. *Compare Youngman v. Tahmoush*, Del.Ch., 457 A.2d 376 (1983); and *Ohio–Sealy Mattress Manufacturing Co. v. Kaplan*, 90 F.R.D. 21, 26 (N.D.Ill.1980) (holding a shareholder-competitor to be a fit derivative plaintiff) *with, e.g., Owen v. Modern Diversified Industries, Inc.*, 643 F.2d 441 (6th Cir.1981) (shareholder-debenture holder

disqualified); *G.A. Enterprises, Inc. v. Leisure Living Communities, Inc.*, 66 F.R.D. 123 (D.Mass.1974) *aff'd* 517 F.2d 24 (1st Cir.1975); *DuPont v. Wyly*, 61 F.R.D. 615 (D.Del.1973); and *Nolen v. Shaw–Walker Co.*, 449 F.2d 506 (6th Cir.1971).

source of it is "entitled" to force it upon the board. Thus, in my opinion, all other factors being held constant, whatever may be a board's duty in the circumstances of receiving a stockholder demand under Rule 23.1, that duty would not be materially different by reason solely of the fact that the information comes from a stockholder, a supplier or customer or even a busybody.

Being of the view that the "entitlement" or not of one to make a demand under Rule 23.1 is, itself, irrelevant to a board's duty upon receiving such a demand, I conclude that a claim that a stockholder is, for the reasons alleged in the complaint in this action, not entitled to make a demand under Rule 23.1 fails to state a claim upon which declaratory relief will be given.

### B.

■ I turn now to the second element of the requested declaratory relief—the request for an adjudication now of the Union's qualification *qua* Schick shareholder to litigate corporate claims *in futuro*. It is at the point of the filing of a derivative suit that the question of standing of a representative plaintiff, if it is to be an issue, is conventionally litigated.[5] In this instance, however, Schick seeks to litigate that question prior to the filing of any such suit.

Given the preference of the law for a liberal reading of the terms of the declaratory judgment statute, there is something to be said for determining this question now. While the issue tendered is not itself a defense to the claims asserted in the demand letter but, rather, is in the nature of a plea in abatement, it nevertheless *is* a legal issue relevant to the specific assertion of the substantive claim. Moreover, it is an issue between intensely adversarial parties that will have to be adjudicated when the Union does assert the corporation's claim[6] and clearly it is an issue that is factually fit for determination now.

What then can be said to justify the conclusion that this aspect of the complaint does not state a claim ripe for judicial determination? Two factors principally lead me to this result. The first deals with the degree of hardship that may foreseeably befall the declaratory plaintiff if a forum is not now provided for resolution of the question it seeks to have resolved; the second relates to possible inefficient use of court resources.

First, the principal, salutary purpose of the declaratory judgment procedure is to provide a technique for early resolution of disputes where a party is suffering practical consequences from uncertainty arising from the assertion by another of a legal claim. Here, while the assertions contained in the ACTWU's demand letter provide a fit occasion for the exercise of the business judgment of the board, they impose no practical injury upon the Company. The performance of no contract is put in doubt. Neither is title to any property, or any legal status or relation placed under a cloud. Accordingly, Schick will be required to bear no hardship if it must await the filing of a derivative claim to litigate its assertion that ACTWU is disabled to act as a representative plaintiff in such action. As to the claimed uncertainty that the board entertains concerning ACTWU's fitness as a potential representative plaintiff in a future derivative litigation, it is, as indicated above, irrelevant to the exercise of the board's judgment now as to whether the Company's interest would likely be promoted by the taking of some action or of no action in response to the May 15th letter. Thus, the central purpose of the declaratory judgment procedure, as stated above, would not be served by taking up this case now.

---

5. *See, e.g., Youngman v. Tahmoush,* Del.Ch., 457 A.2d 376 (1983); *Rothenberg v. Security Management Co.,* 736 F.2d 1470 (11th Cir.1984); *Darrow v. Southdown, Inc.,* 574 F.2d 1333 (5th Cir.1978).

6. I am content that the present motion should be decided on the assumption that the ACTWU will attempt to bring the derivative suit it has

asserted it intends to bring. It has threatened to do so and there would be little left of the Declaratory Judgment Act if the fact that a declaratory judgment defendant has not yet actually brought suit on his claim is itself deemed a reason to treat the declaratory claim as premature.

Second, resolution of the disqualification issue would leave unresolved the substantive claim relating to the alleged breaches of fiduciary duty asserted by the declaratory defendant and leave that claim as litigable after the declaratory action as before. No case has been cited in which a court has exercised declaratory judgment jurisdiction over an issue of the limited character presented by this complaint. Any case in which a court takes up as a declaratory matter a claim that defendant is barred by limitations or laches from asserting the substantive claim, would obviously be different than this case in a significant way. In any such case (although no case of this kind has been cited either), an adjudication of such a bar—while not addressing the merits of the claim—will effectively preclude further litigation.

Where declaratory plaintiff seeks to litigate an issue of this limited character, a court is presented with special considerations relating to the efficient use of judicial resources. Since, even should plaintiff prevail, the substantive underlying claims will remain for possible future litigation, the benefits of the proceeding may be marginal.

In summary, Schick is suffering no current adverse economic or other impact from the assertion of the May 15th demand letter, nor is it imminently threatened with such a consequence. It can, therefore, show no good reason why the conventional technique for raising and deciding its claim of disqualification should be supervened in this instance. To do so would not only threaten a waste of judicial resources, but, assuming that such claim will be upheld by whatever court addresses it on the merits, would risk, as well, the employment of the declaratory judgment device as a means to possibly achieve procedural advantage.[7] Employment of the declaratory judgment procedure solely to achieve tactical advantage should not be endorsed.

For the foregoing reason, the defendant's motion shall be granted and the complaint herein dismissed. IT IS SO ORDERED.

---

7. For example, if the issue of disqualification were litigated in a derivative suit in the jurisdiction in which Schick has its principal office and the Company's motion were granted, the case would apparently not be dismissed before notice were provided to other shareholders. *See*

Conn.Gen.Stats. § 52–572j(a) (1985). A similar result would obtain under the federal procedure. *See* F.R.Civ.P. 23.1. Such a step would not be required if the question were litigated in this action, or indeed in a derivative action under our version of Rule 23.1.