KLM ROYAL DUTCH AIRLINES,
Plaintiff,

v.

Alfred A. CHECCHI, Gary L. Wilson, Frederick V. Malek, Richard C. Blum, Thomas L. Kempner, John H. Dasburg, George J. Vojta, Duane E. Woerth, Thomas Ducy, Marvin L. Griswold, V.A. Ravindran, and Northwest Airlines Corporation, Defendants.

Civ. A. No. 14764.

Court of Chancery of Delaware,
New Castle County.

Submitted: Sept. 12, 1996.
Decided: Jan. 14, 1997.

Michael D. Goldman, James F. Burnett and Stephen C. Norman, of Potter Anderson & Corroon, Wilmington (Frederick A.O. Schwarz, Jr. and David A. Stoll, of Cravath, Swaine & Moore, New York City, of counsel), for Plaintiff.

R. Franklin Balotti, Anne C. Foster, Raymond J. DiCamillo and Luke E. Dembosky, of Richards, Layton & Finger, Wilmington (Melvyn L. Cantor, David J. Woll and Andre K. Cizmarik, of Simpson Thacher & Bartlett, New York City, of counsel), for Defendants.

## OPINION

STEELE, Vice Chancellor.

### I. Issue Presented

An existing agreement grants a current stockholder an option to purchase additional shares of the corporation during a 30–day window in August 1998. The corporation later enacts a shareholder rights plan (or poison pill) that, based upon the stockholder's current percentage holdings, will be triggered if the option is exercised. Is the stockholder's action to obtain a declaratory judgment and order rescinding the rights plan or exempting its option before the exercise date presently ripe for decision? I conclude that it is, because the stockholder has alleged facts demonstrating the present effects of the rights plan, the likelihood that delay of resolution may cause significant fu-

ture harm, and that the parties' circumstances are sufficiently static. The motion to dismiss must be denied.

## II. Background [1]

Plaintiff in this action is KLM Royal Dutch Airlines, one of a number of investors in a 1989 leveraged buy-out of Northwest Airlines. In 1992 KLM contributed an additional $50 million as part of an emergency $250 million loan necessary to keep Northwest out of bankruptcy. The restructuring of Northwest that followed necessitated additional agreements among the investors and Northwest's unions. In consideration for its part of the loan and its efforts in persuading others to join in the rescue effort, KLM received various concessions from Northwest and its investors including proportionate board representation, registration rights, and an option on additional shares of Northwest common stock. Particularly relevant to this action is the option agreement granting KLM the right to buy specific amounts of the common stock holdings of other investors in exchange for Northwest preferred stock currently held by KLM. This option is exercisable only between 1–31 August 1998. Should KLM decline to exercise the option, the same investors may force KLM to buy the same number of shares during the period between 1–31 August 1999.

KLM currently holds approximately 18.8% of Northwest's outstanding common stock. For reasons that are not made clear in the complaint, however, KLM is contractually prohibited from selling any of its common stock before 15 June 1997. KLM's option is for an additional 4.6% of Northwest's common stock. Of the remainder of Northwest's outstanding common stock, approximately 28% is publicly owned, approximately 25% is owned by Northwest's unions, and private investors own the rest. The private investors, their close allies and Northwest union representatives account for eleven of Northwest's fourteen member board of directors. KLM has the right to fill the three remaining director positions.

On 16 November 1995, Northwest's board of directors met, considered and adopted a shareholder rights plan by a vote of eleven to three. The implementation and terms of the rights plan are as follows: Northwest declared a dividend of one preferred share purchase right for each common share outstanding as of 27 November 1995; each right entitles the holder to purchase one one-hundredth of a share of Series D Junior Preferred Stock at an exercise price of $150; a "flip in" provision entitles the holder, on payment of the exercise price, to that number of common shares with a market value equal to two times the exercise price; the "flip in" provision is triggered by the acquisition of a 19% or greater stake in Northwest's common stock. Of course, the acquiring entity is excluded from the rights plan. The "flip in" applies only if the acquisition of a percentage sufficient to trigger the "flip in" provision occurs after the time of the plan's adoption. The effect of this latter exemption is to grandfather various Northwest investors who collectively hold greater than 19% of Northwest's common stock.

Based upon its current holdings, if KLM exercises its option it will exceed the 19% trigger, thereby substantially diluting the value of its common share holdings. Not surprisingly, KLM's three director designees voted against the plan. At the board meeting, Northwest argued the poison pill was necessary to prevent KLM from gradually and surreptitiously gaining control of Northwest. KLM argued that neither KLM nor anyone else posed any hostile threat to Northwest; pointing out it had previously represented both orally and in writing that it was willing to limit its stake to 25%, and was prohibited by U.S. law from voting more than 25% of Northwest's common stock. KLM also argued that the plan would interfere with the exercise of its option. They therefore asked that the trigger be set at a higher percentage or, in the alternative, that KLM be exempted in a manner similar to the other investors. The eleven non-KLM di-

---

1. Because this case is before me on defendants' motion to dismiss, all facts are drawn from plaintiff's complaint and accepted as true for present purposes. *See generally Vanderbilt Income &* *Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.,* Del.Supr., 691 A.2d 609 (1996). Discussion of the facts is kept to the minimum necessary to address the current motion.

rectors, defendants in this action with Northwest,[2] nonetheless adopted the plan as proposed.

Shortly after the adoption of the rights plan, KLM brought suit seeking a declaration that the defendant directors breached their fiduciary duties in adopting the poison pill and caused Northwest to breach contractual obligations to KLM. KLM also seeks an order rescinding the rights plan or exempting KLM's option, restraining the defendant directors and Northwest from interfering with KLM's contractual rights and awarding costs and attorneys' fees. Northwest has responded by their motion to dismiss KLM's complaint on the grounds that KLM's claims are not presently ripe for adjudication.

### III. Discussion

The purpose of a declaratory judgment is "to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations[.]"[3] In other words, the objective of such an action is to advance the stage of litigation between the parties in order to address the practical effects of present acts of the parties on their future relations. In this way the declaratory judgment serves to "promote preventive justice."[4] The obvious benefits of the declaratory judgment must be weighed carefully, however, against the possibility that the declaration will be an advisory opinion. Advisory opinions ill-serve the judicial branch and the public by expending resources to decide issues that may never come to pass. More importantly, the judiciary's role in the lawmaking process is an interstitial one, carried out by the application of legislative enactments and common law principles to concrete factual circumstances that have created real and present controversies. An action seeking declaratory relief is not exempt from these requirements and must present the court with an actual controversy that is ripe for judicial decision.[5] The dispute between the parties, therefore, must be actual, not hypothetical. Determining whether the parties' dispute is ready for decision requires consideration of, *inter alia*, the present effects of the challenged conduct versus the future harm to be suffered by the plaintiff if resolution is delayed, the likelihood of a change in the factual circumstances, and the legal issues involved. These considerations must be weighed against the important policies enumerated above.[6]

In the present case, defendants advance two main arguments in support of their motion. First, defendants argue their adoption of the rights plan has no present effect on KLM because KLM has no present right to exercise the option, and KLM must therefore wait to see what Northwest's position will be in August of 1998. Second, they argue the facts are too uncertain to justify decision now because either the board or KLM may take action in the future that would render KLM's present claim moot. I reject both of these arguments, and conclude the adoption of the rights plan has a present and negative practical effect on KLM, and that the factual circumstances are sufficiently static to provide a justiciable controversy.

Northwest's first argument is that KLM's complaint now seeks a declaration that future action by Northwest's board will violate fiduciary duties and interfere with its contractual obligations.[7] This is so, Northwest argues, because its board expressly declined to consider exempting KLM's option from the rights plan until some later date. But this misses the thrust of KLM's complaint that the rights plan was at the time of its adoption a breach of the directors' fiduciary obligations and presently interferes with

---

**2.** For the sake of convenience, all defendants will hereafter be referred to collectively as "Northwest."

**3.** 10 *Del. C.* § 6512 (1981) (Declaratory Judgment Act, "Purpose and construction of chapter").

**4.** *Stabler v. Ramsay*, Del.Super., 88 A.2d 546, 551 (1952).

**5.** *See Rollins Int'l, Inc. v. International Hydronics Corp.*, Del.Supr., 303 A.2d 660, 662–63 (1973).

**6.** *See Schick, Inc. v. Amalgamated Clothing & Textile Workers Union*, Del. Ch., 533 A.2d 1235, 1239 (1987).

**7.** *See* Defs.' Open. Brief at 14.

KLM's contractual rights. Cases relied upon by Northwest in support of its argument therefore do not help its cause. For example, in *Wells Fargo & Co. v. First Interstate Bancorp,* Chancellor Allen concluded: "Whether there is tortious interference cannot be determined until the acts that might arguably constitute such interference have occurred and a claim of such interference, direct or implicit, is made."[8] Similarly, in *Rhone–Poulenc v. GAF Chemicals Corp.,* the plaintiff sought a declaration that the exercise of an option would not be a breach of the exercisor's fiduciary duties.[9] In these and other cases cited by Northwest, the action at issue had yet to be taken. In the present case, however, KLM does not seek this Court's ruling on some future act, but a declaration as to actions already taken by Northwest's board.

KLM identifies several injurious effects of the rights plan. Most immediately, it argues the adoption of the rights plan depresses the value of its current Northwest holdings. This may be so for a number of reasons, but it is particularly so because Northwest will be forced to sell a significant percentage of its shares in order to avoid triggering the "flip in" provision if it exercises its option. Northwest points out that KLM has already indicated it will exercise the option only if it is "in the money" and thus may decide not to exercise the option at all. KLM responds that the option has never been "out of the money," and that Northwest shares would have to be nearly worthless for it to be so. Perhaps more to the point, it will be remem-bered that the back end of the option agreement allows the counterparty to put the same number of shares to KLM if it does not exercise the option. In effect, the counterparty investors could force KLM to trigger the "flip in" provision, substantially diluting KLM's investment with no corresponding effect on their own holdings. It must additionally be remembered that KLM is at present contractually prohibited from selling any of its common shares.[10] KLM has thus alleged, sufficient to withstand the current motion, both a present injurious effect and a strong likelihood of future harm if it cannot now obtain a declaration concerning the application of the rights plan to the exercise of its option.

Similarly off the mark is Northwest's argument that KLM has no contractual right to be free from application of the rights plan. The argument addresses the merits of KLM's claims, not the ripeness of those claims. Northwest is either obligated to exempt KLM's option from the rights plan (or be in breach) or it is not. The determination of that question need not await the actual exercise date.[11]

As noted above, Northwest also argues there are any number of events that might render KLM's claims moot. That is, Northwest's board may later decide to redeem the preferred share purchase rights, they may decide to exempt KLM's option, or KLM may decide not to exercise its option. The defendants argue that the rights and circumstances of the parties are susceptible to significant change and, by logical inference, determinable only when KLM has the right to

---

8. Del. Ch., C.A. No. 14696–NC, Allen, C. (Jan. 18, 1996), Mem. Op. at 21, 1996 WL 32169.

9. Del. Ch., C.A. No. 12848–NC, Hartnett, V.C. (Apr. 8, 1993), Let. Op. at 1, 1993 WL 125512.

10. Northwest argues KLM could take several possible steps to help it reduce its holdings by August 1998. *See* Defs.' Reply Brief at 12. Yet each of these steps depend on further discretionary action by defendants. KLM's argument is that the defendants have already taken steps to interfere with what it considers to be a contractual right to exercise the option under the terms as originally agreed. Even assuming KLM might reasonably expect defendants to take any of their recommended steps, the invitation does not address KLM's complaint that Northwest has uni-laterally amended the conditions of the option agreement to KLM's distinct disadvantage and in breach of that agreement.

11. *See, e.g., Western Air Lines, Inc. v. Allegheny Airlines, Inc.,* Del. Ch., 313 A.2d 145, 150, n. 9 (1973) ("[The] threatened breach of contract aspect of the dispute, coupled with a legitimate need of plaintiffs to seek the protection of [equitable] relief, would justify equitable jurisdiction."); *Diebold Computer Leasing, Inc. v. Commercial Credit Corp.,* Del.Supr., 267 A.2d 586, 590 (1970) ("It is agreed that the breach against which preventive relief is sought in equity need not have been actually committed at the time of the application for relief; it being a sufficient ground of judicial interference that the defendant, as of that time, claims and insists upon his right to do the act complained of.").

exercise its option. According to the complaint, the counterparties to the option effectively control Northwest's board of directors. There is no question that Northwest's board was fully aware of KLM's option at the time it adopted the rights plan. It therefore seems at least unlikely that Northwest's directors will later change their minds and decide to redeem the purchase rights or otherwise exempt KLM. In any event, it does nothing to answer KLM's claim that the poison pill presently interferes with its contractual rights to exercise the option in the future.[12]

Nor does it make practical sense to require KLM to wait until it may exercise the option before bringing suit. From KLM's perspective, it is hardly reasonable to gamble that it will prevail on its claims. The financial consequences of losing would be too severe to be considered sound business practice. From the judicial perspective, I note that the conservation of court resources is best served by an orderly and efficient administration of justice. Northwest points out the Court of Chancery is well used to and equipped to deal with expedited matters. While this indeed may be true, entertaining matters on an expedited basis rarely presents the most orderly or efficient method of resolving disputes.

### IV. Conclusion

In sum, consideration of the present circumstances in this action convinces me that the dispute between the parties presents an actual controversy that is ripe for judicial determination. The present effect of the rights plan, the possible harm suffered by KLM if it cannot now determine its rights *vis à vis* the exercise of the option, and efficient management of the action are all in favor of allowing KLM to pursue its claims now. Northwest's motion to dismiss is *denied.*

---

**12.** *See generally* Moran v. Household Int'l, Inc., Del. Ch., 490 A.2d 1059, 1072, *aff'd,* 500 A.2d 1346 (1985) (rejecting defendant board of directors' argument that challenge to poison pill must await events bringing it into play); *The* Cooper Cos. v. Cooper Dev. Co., Del. Ch., C.A. No. 10729, Jacobs, V.C. (June 15, 1989), Mem. Op. at 20–21, 1989 WL 69395 (ability of party to render controversy moot does not, *ipso facto,* mean claim is not ripe).