# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BLUE CUBE SPINCO LLC, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N21C-01-214 PRW |
| | ) | CCLD |
| THE DOW CHEMICAL COMPANY, | ) | |
| Defendant. | ) | |

Submitted: June 18, 2021
Decided: September 29, 2021

*Upon Defendant The Dow Chemical Company's Motion to Dismiss,*
**GRANTED,** in part, and **DENIED**, in part.

## MEMORANDUM OPINION AND ORDER

David E. Ross, Esquire, Adam D. Gold, Esquire, Anthony M. Calvano, Esquire, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Craig C. Martin, Esquire, Matthew J. Thomas, Esquire, Skyler J. Silvertrust, Esquire, Chloe Holt, Esquire, WILLKIE FARR & GALLAGHER LLP, Chicago, Illinois; Shaimaa M. Hussein, Esquire, WILLKIE FARR & GALLAGHER LLP, New York, New York, *Attorneys for Plaintiff Blue Cube Spinco LLC*.

David J. Soldo, Esquire, MORRIS JAMES LLP, Wilmington, Delaware; Joseph B. Schmit, Esquire, Richard Weingarten, Esquire, PHILLIPS LYTLE LLP, New York, New York, *Attorneys for Defendant The Dow Chemical Company*.

**WALLACE, J.**

This indemnification dispute follows from an asset sale through which non-party Olin Corporation acquired business lines and landed properties in the form of a merger vehicle—plaintiff Blue Cube Spinco LLC (the "Company" and together with Olin, the "Buy-Side")—created by the seller, defendant The Dow Chemical Company. After the transaction closed, the Buy-Side sought to improve the site on which one of those assets, a manufacturing facility in Stade, Germany (the "Building"), resides. To do so, the Company applied for expansion permits from the German government.

That application was denied. Apparently, Dow registered a pre-closing partition that put the Building in violation of positive zoning law (the "Code Violation"), disqualifying a Building project from regulatory approval while the Code Violation persists. To cure the Code Violation, the Buy-Side concluded it must demolish the Building's overextended dimensions and undertake related remediation efforts. Having fronted some consulting and reconstruction costs, the Company turned to Dow for reimbursement and ongoing coverage, citing provisions in the parties' agreement that purport to impose on Dow a duty to indemnify "any and all" losses generated by the Code Violation.

Dow refused coverage for "all" costs, prompting a series of letters through which the parties attempted to negotiate a settlement. Unable to pin Dow to a satisfactory figure, the Company initiated litigation. Its complaint has two claims:

-2-

breach-of-contract ("Count I") and declaratory judgment ("Count II"). As it did before, the Company, through Count I, contends Dow breached its duty to cover "any and all" "Loss"—a definition that the Company says the Code Violation plainly meets. For Dow's dereliction the Company alleges past and future damages. In Count II, the Company requests a declaration that Dow must cover "any and all" Code Violation Loss. In truth, there is no substantive difference between the Counts.

Dow has moved to dismiss both Counts under Rules 12(b)(1) and 12(b)(6). According to Dow, the Company has failed to state a reasonably conceivable and ripe set of claims that is based on a definite and unexcluded loss and for which an immediate declaration is appropriate. Not wholly so.

It is reasonably conceivable that Dow must indemnify "any and all" Loss the Company sustains in remedying the Code Violation. In other words, Count I fully addresses the Company's injury. For that very reason, however, the Company doesn't need—and can't retain—Count II. A plaintiff can't duplicate a breach-of-contract claim by just recasting it in declaratory language. Accordingly, Dow's motion is **GRANTED**, in part, and **DENIED**, in part.

## I. FACTUAL BACKGROUND

### A. THE TRANSACTION.

Olin and Dow manufacture and sell chemicals.[1]  In the spring of 2015, Olin agreed to purchase three of Dow's molecular firms and the tangible and intangible assets associated with those lines.[2]  The transaction closed on October 5, 2015 (the "Distribution Date"), and involved a few triangulated steps.[3]  First, Dow formed the Company.[4]  Next, Dow divested itself of the properties Olin wanted, including the Building (the "Transferred Assets"), and conveyed them to the Company.[5]  An agreement between Dow and the Company memorialized this phase (the "Separation Agreement").[6]  Last, Olin acquired all the Company's stock from Dow under the terms of a contract between the three (the "Merger Agreement" and together with the Separation Agreement, the "Transaction Documents").[7]  This case principally

---

[1]  Compl. ¶ 5 (D.I. 1).

[2]  *Id.* ¶ 7.

[3]  *Id.*  The transaction closed in March 2015 but did not become effective until October.  *Id.*

[4]  *Id.*

[5]  *Id.*

[6]  *Id.*; Ex. B to Compl. (hereinafter "SA") (D.I. 1).

[7]  Compl. ¶ 7; Ex. A to Compl. (hereinafter "MA") (D.I. 1).

concerns the Separation Agreement, which granted the Company contractual rights that permit it to seek indemnification.[8]

## B. THE TERMS.

The Separation Agreement is a glossary of interwoven terms. Relevant to Dow's motion are provisions concerning losses, liabilities, indemnification notices, waivers, and remedy disclaimers.

### 1. Losses and (Excluded) Liabilities.

Dow agreed to indemnify the Company for "any and all" "Losses" that are "actually suffered or incurred" and attributable to an "Excluded Liability."[9] "Losses" are defined broadly to encompass: "'Liabilities,' claims, losses, damages, costs, expenses, interest, awards, judgments and penalties."[10] Liabilities, in turn, are defined with commensurate breadth to include real and theoretical exposures:

> any and all debts, liabilities and obligations, whether accrued or unaccrued, fixed or variable, known or unknown, absolute or contingent, matured or unmatured or determined or determinable, including those arising under any Law . . . contract, lease, agreement, arrangement, commitment or undertaking.[11]

---

[8] Compl. ¶¶ 8, 10.

[9] SA § 1 (Definitions); *id.* § 4.02 (Indemnification by Dow).

[10] *Id.* § 1 (Definitions).

[11] *Id.*

And the term "Law" means "any federal, national, foreign, supranational, state, provincial or local statute, law, ordinance, regulation, rule, code, order [or] requirement."[12]

An Excluded Liability is defined negatively to mean not an "Assumed Liability."[13] The difference is temporal. Assumed Liabilities are defined, in pertinent part, as "all Liabilities of Dow to the extent arising out of, or relating to, . . . the Transferred Assets, in each case *on or after* the Distribution Date."[14] Inferentially, then, an Excluded Liability must be an exposure caused by a Transferred Asset and that existed *before* the Distribution Date.

Construed together, Dow has a duty to indemnify every Liability-produced Loss the Company sustains, including from a Building-based Liability, that attached before the transaction closed and regardless of whether the Liability's monetary value has been conclusively identified and calculated at the time coverage is sought.

**2. Indemnification Notices and Waivers.**

To lodge an indemnification claim, the Company must, under Section 4.06(a), provide Dow with (i) a "prompt . . . written notice" that (ii) describes "in reasonable detail the amount of Loss, if known" and (iii) identifies the "provisions" in the

---

[12] *Id.*

[13] *Id.*

[14] *Id.* (emphasis added).

Separation Agreement on which the Company bases its claim (the "Notice Provision").[15]

The Notice Provision is silent on a non-conforming notice's consequences. But a neighboring provision says that a non-conforming notice does not extinguish the Company's indemnification rights. Under the "No Waiver Provision," the parties agreed "no failure or delay by any party . . . in exercising any right . . . shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or future exercise of any other right" under the Separation Agreement.[16] Stated illustratively, the parties agreed a failure to exercise a right properly—*e.g.*, the Company's right to indemnification—does not waive that right—*e.g.*, prevent the Company from seeking indemnification. As applied, a notice that is not prompt, reasonably detailed, or both, does not give Dow a complete defense to providing coverage for which the Company otherwise is eligible.

### 3. Disclaimers.

Finally, the Separation Agreement contains two remedy disclaimers. The first purports to eliminate Dow's liability for certain defects in the Transferred Assets (the "Transferred Asset Disclaimer").

---

[15]  *Id.* § 4.06(a) (Notice of Loss; Third-Party Claims).

[16]  *Id.* § 8.09 (Waiver).

It reads:

> EXCEPT AS MAY EXPRESSLY BE SET FORTH IN ANY TRANSACTION DOCUMENT, ALL TRANSFERRED ASSETS ARE BEING TRANSFERRED ON AN "AS IS," "WHERE IS" BASIS AND THE PARTIES HERETO SHALL EACH BEAR THEIR RESPECTIVE ECONOMIC AND LEGAL RISKS TO THE EXTENT RESULTING FROM (A) ANY CONVEYANCE BEING INSUFFICIENT TO VEST IN THE TRANSFEREE GOOD TITLE, FREE AND CLEAR OF ANY ENCUMBRANCE; (B) ANY FAILURE TO OBTAIN ANY NECESSARY CONSENTS OR APPROVALS OF ANY THIRD PARTIES OR GOVERNMENTAL AUTHORITIES; AND (C) ANY FAILURE TO COMPLY WITH THE REQUIREMENTS OF ANY LAW.[17]

And the second purports to preclude the Company from seeking various species of damages (the "Damages Disclaimer").

> IN NO EVENT SHALL ANY PARTY . . . BE LIABLE TO ANY OTHER PARTY . . . FOR PUNITIVE, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES, INCLUDING LOSS OF FUTURE PROFITS, REVENUE OR INCOME, DIMINUTION IN VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY (INCLUDING NEGLIGENCE) ARISING IN ANY WAY OUT OF THIS AGREEMENT, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE . . . .[18]

## C. THE CODE VIOLATION.

Before the transaction closed, Dow partitioned the Stade site.[19]  In February 2015, Dow registered the partition with the German government.[20]  At closing, Dow

---

[17]  *Id.* § 7.01 (Disclaimer).

[18]  *Id.* § 7.02 (Limitation of Liability).

[19]  Compl. ¶ 11.

[20]  *Id.*

appears to have represented that the Transferred Assets were compliant with Laws "necessary to own, lease, or operate" those Assets.[21]

Two years after closing, the Company sought to renovate the Building and to improve its grounds.[22] To do so, the Company petitioned the German government for expansion permits. But the German government denied the application, explaining that the repositioned plots caused the Code Violation.[23] It seems Dow's partition brought the Building too close to an adjacent facility to leave room for another extension. A "building supervisory authority" accordingly instructed the Company that, to obtain the permits, it must cure the Code Violation.[24] And reportedly, those efforts would require the Company to reconstruct, at its own

---

[21] MA § 4.10.

[22] Compl. ¶¶ 11–15.

[23] *Id.* ¶ 12. The Company identifies "the *Bauordung* [*sic*] *Niedersachsen* (Building Code Lower Saxony)" as the property regime that allegedly proscribed Dow's partition. *Id.* The Court took judicial notice of that regime for the sole purpose of confirming its existence. *See Windsor I, LLC v. CWCap. Asset Mgmt. LLC*, 238 A.3d 863, 873 (Del. 2020) (observing that, on a motion to dismiss, this Court may consider matters extraneous to the pleadings when the matter "is not being relied upon to prove the truth of its contents" (internal quotation marks omitted)). Ultimately, the Company will bear the burden of introducing and establishing the *Bauordnung Niedersachsen*'s contents if those contents are later found to govern a substantive issue. *See Rep. of Pan. v. Am. Tobacco Co.*, 2006 WL 1933740, at *5 (Del. Super. Ct. June 23, 2006) (citing Del. Super. Ct. Civ. R. 44.1); *see also Germaninvs. AG v. Allomet Corp.*, 225 A.3d 316, 333 (Del. 2020) (same under identical Ch. Ct. R. 44.1); *see generally* Del. R. Evid. 202(e).

[24] Compl. ¶ 15.

expense, the Stade site, and to secure two easements from Dow so a team could access the site.[25]

The Code Violation allegedly has not been free. The Company says it has hired architects to reduce the Building's swollen dimensions.[26] The Company also alleges it has retained counsel to investigate the Code Violation's ramifications and to pursue avenues for defending it.[27] As a byproduct of this assistance, the Company further alleges it "currently plans" to demolish a façade at the Stade site to ensure the Building is properly coded.[28] And to achieve those and other goals, the Company "expect[s]" it "will incur" "significant additional damages," including more reconstruction costs and legal fees, and possibly, "business interruption losses."[29]

## D. THE INDEMNIFICATION DISPUTE.

On October 19, 2020, Olin, on behalf of the Buy-Side, sent Dow an indemnification notice (the "October Notice").[30] In the October Notice, Olin described the Code Violation, listed its present and future expenses, and cited to specific provisions in the Separation Agreement that purport to implicate Dow's

---

[25]  *Id.*

[26]  *Id.* ¶ 22.

[27]  *Id.*

[28]  *Id.*

[29]  *Id.* ¶¶ 28–29.

[30]  *Id.* ¶ 23 (citing Ex. C to Compl. (hereinafter "Oct. Notice") (D.I. 1)).

coverage duties.  Relying on the Loss and Liability definitions, Olin demanded Dow indemnify "any and all" costs produced by the Code Violation.  At that time, Olin estimated a figure of no less than €20 million.

The October Notice arrived five years after the transaction closed.  But the October Notice suggests Dow knew about the Code Violation beforehand.  For example, the October Notice explains to Dow that Olin "ha[d] proposed a significantly more cost-effective option [than €20 million] for Dow's consideration without success."[31]  The October Notice also reminds Dow that it

> created property boundaries applicable to [the Company's] Bisphenol A building at its Stade Facility (the "Building") . . . such that the Building was not in compliance with applicable [l]aw as of [the closing date].  Specifically, the property boundaries created by [Dow] caused the [B]uilding to fail to comply with [the] local building code and fire protection code.[32]

Dow did not respond to the October Notice in writing.  Instead, the October Notice spurred the parties to resume settlement discussions that lasted until December.[33]  Those went nowhere.  As a result, Olin sent Dow a second indemnification notice on January 7, 2021 (the "January Notice").[34]  The January

---

[31]  Oct. Notice at 2.

[32]  *Id.* at 1.

[33]  Compl. ¶ 24.

[34]  *Id.* ¶ 25 (citing Ex. D to Compl. (hereinafter "Jan. 7 Notice") (D.I. 1)).

Notice reiterated the October Notice's substance and added an ultimatum. It warned Dow that it must accept its full indemnification duties by January 22 or risk breach.[35]

Dow replied to the January Notice five days later.[36] Dow first agreed to grant the Company the easements it needed for accessing the Stade site's violative portions. Dow then offered to settle the Code Violation for €1.2 million. But Dow conditioned its offer on a total release of liability for expenses above that ceiling.[37] Because of that condition, Olin rejected Dow's offer.[38]

In its rejection letter, Olin conceded €1.2 million was its "current[] estimate[]" of the Buy-Side's costs.[39] Olin then inserted a caveat, namely, a projection that costs probably would surpass €1.2 million. To support its position, Olin pointed to unobtained government authorizations and unconfirmed reconstruction plans. Given those variables, Olin refused to accept anything less than Dow's duty to indemnify "any and all" Loss. Olin concluded by extending the January Notice's breach deadline to January 26.

Dow responded by agreeing to pay for some demolition expenses, but not

---

[35] Jan. 7 Notice at 1.

[36] Compl. ¶ 26 (citing Ex. E to Compl. (hereinafter "Dow's First Resp.") (D.I. 1)).

[37] Dow's First Resp. at 1.

[38] Compl. ¶ 27 (citing Ex. F to Compl. (hereinafter "Jan. 19 Notice") (D.I. 1)).

[39] Jan. 19 Notice at 1–2.

every item Olin enumerated.[40] Dow clung to its view that €1.2 million would resolve the matter fully, together with "final approval . . . from the local authorities, who ha[d] been involved in mapping out" a solution.[41] In other words, Dow did not accept responsibility for "all" the Code Violation's purported costs. So, the Company treated Dow's letter as a repudiation and sued.

### E. THIS LITIGATION.

The Company brings a two-count complaint. Count I alleges Dow breached the Separation Agreement by failing to indemnify "any and all" Losses generated by the Code Violation. As a remedy, the Company seeks, among other compensatory relief, "damages in an amount to be determined at trial."[42]

Count II copies the same allegations, but articulates them in declaratory language. In Count II, the Company asks the Court to declare that Dow must pay "any and all costs . . . that [it] has incurred or will incur in connection with remedying the Code Violation."[43]

Dow has moved to dismiss the complaint.[44] Invoking Rule 12(b)(6), Dow

---

[40] Compl. ¶ 28 (citing Ex. G to Compl. (hereinafter "Dow's Second Resp.") (D.I. 1)).

[41] Dow's Second Resp. at 1.

[42] Compl. ¶ 36; *id.* at Prayer § (c).

[43] *Id.* ¶ 39(a).

[44] Def.'s Mot. to Dismiss (D.I. 4); Def.'s Opening Br. in Supp. of Mot. to Dismiss (D.I. 4) ("Dow Br.")

contends the Company's conclusory allegations are insufficient to make reasonably conceivable (i) the Code Violation's existence, (ii) Dow's breach of its coverage duties, and (iii) the Company's damages. As reinforcements, Dow erects the Transferred Asset and Damages Disclaimers, as well as the Notice Provision, as barriers to coverage. And separately, Dow invokes Rule 12(b)(1) to argue that Count II—which Dow posits seeks exclusively future damages—fails to allege a now-ripe controversy. Not unexpectedly, the Company opposes Dow's motion.[45]

The Court heard argument.[46] During the hearing, the Court questioned whether Count II alleged relief distinct from Count I. Specifically, the Court wondered whether the case could proceed solely on breach-of-contract grounds.[47] In response, the Company insisted a declaration remains necessary because renovating the Building is an "ongoing project" for which the Company already did and will "incur[] costs."[48] And when further pressed,[49] the Company took a different tack—analogizing its proposed declaration to "guardrails" that would ensure "losses, the defined term, are indemnified here."[50]

---

[45] Pl.'s Ans. Br. in Opp'n to Def.'s Mot. to Dismiss (D.I. 10) ("BC Br.").

[46] Hr'g Tr. (D.I. 22).

[47] *Id.* at 31.

[48] *Id.*

[49] *Id.* at 32.

[50] *Id.* at 32–33.

-14-

## II. STANDARDS OF REVIEW

### A. MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION.

A party may move to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction.[51] "'Whenever it appears by suggestion of the parties or otherwise' that the Court lacks subject matter jurisdiction, the Court must dismiss the claim."[52] In considering a Rule 12(b)(1) motion, the Court "need not accept [the plaintiff's] factual allegations as true and is free to consider facts not alleged in the complaint."[53] Accordingly, whereas the movant "need only show that the Court lacks jurisdiction,"[54] the non-movant bears the "far more demanding" burden "to prove jurisdiction exists."[55]

### B. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM.

Under Rule 12(b)(6), a party might also move to dismiss for failure to state a

---

[51]  Del. Super. Ct. Civ. R. 12(b)(1).

[52]  *KT4 Partners LLC v. Palantir Techs. Inc.*, 2021 WL 2823567, at *24 (Del. Super. Ct. June 24, 2021) (alteration and emphasis omitted) (quoting Del. Super. Ct. Civ. R. 12(h)(3)).

[53]  *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1284 n.14 (Del. 2007) (internal quotation marks omitted); *see Nelson v. Russo*, 844 A.2d 301, 302 (Del. 2004) ("In deciding whether the Superior Court has subject matter jurisdiction, we must look beyond the language in the complaint . . . ."); *see also Texcel v. Com. Fiberglass*, 1987 WL 19717, at *2 (Del. Super. Ct. Nov. 3, 1987) ("The gravamen of subject matter jurisdiction . . . lies not in the pleading but in the existence of facts necessary for the court to exercise its jurisdiction.").

[54]  *Airbase Carpet Mart, Inc. v. AYA Assocs., Inc.*, 2015 WL 9302894, at *2 (Del. Super. Ct. Dec. 15, 2015), *aff'd*, 2016 WL 4938890 (Del. Sept. 16, 2016).

[55]  *Appriva*, 937 A.2d at 1284 n.14 (internal quotation marks omitted).

claim upon which relief can be granted.[56]  In resolving a Rule 12(b)(6) motion, the

Court (1) accepts as true all well-pleaded factual allegations in the complaint;

(2) credits vague allegations if they give the opposing party notice of the claim;

(3) draws all reasonable factual inferences in favor of the non-movant; and (4) denies

dismissal if recovery on the claim is reasonably conceivable.[57]  The Court, however,

need not "accept conclusory allegations unsupported by specific facts or . . . draw

unreasonable inferences in favor of the non-moving party."[58]  The Court will reject

"every strained interpretation of the allegations proposed by the plaintiff."[59]  Still,

Delaware's pleading standard is "minimal."[60]  Dismissal is inappropriate unless

"under no reasonable interpretation of the facts alleged could the complaint state a

claim for which relief might be granted."[61]

"The complaint generally defines the universe of facts that the trial court may

---

[56]  Del. Super. Ct. Civ. R. 12(b)(6).

[57]  *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

[58]  *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

[59]  *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[60]  *Cent. Mortg.*, 27 A.3d at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 895 (Del. 2002)).

[61]  *Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 251 A.3d 1016, 1023 (Del. Super. Ct. 2021) (internal quotation marks omitted); *see Cent. Mortg.*, 27 A.3d at 537 n.13 ("Our governing 'conceivability' standard is more akin to 'possibility' . . . .").

consider in ruling on a Rule 12(b)(6) motion . . . ."[62]  But, "for carefully limited purposes,"[63] the Court "may consider matters outside the pleadings when the document is integral to . . . a claim and incorporated into the complaint."[64]  "[A] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law."[65]

### III.  DISCUSSION

The parties' arguments turn on the meaning of disputed terms in the Separation Agreement.  Delaware law governs the Separation Agreement,[66] and in Delaware, a contract's proper construction is a question of law.[67]  The goal of contract interpretation "is to fulfill the parties' expectations at the time they contracted."[68]  "A court must accept and apply the plain meaning of an unambiguous term . . . in the contract language . . ., insofar as the parties would have agreed *ex*

---

[62]  *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

[63]  *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995).

[64]  *Windsor I*, 238 A.3d at 873 (internal quotation marks omitted).

[65]  *Malpiede*, 780 A.2d at 1083.

[66]  SA § 8.12.

[67]  *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1266–67 (Del. 2017).

[68]  *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (internal quotation marks omitted).

*ante*."[69]  To that end, the Court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[70]  "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[71]

The Court's contract interpretation must be reasonable, reading the agreement "in full and situated in the commercial context between the parties."[72]  Together with that context, the parties' business relationship "give[s] sensible life" to their contract.[73]  But "background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement."[74]  "When the contract is clear and unambiguous, [courts] will give effect to the plain [] meaning of the contract's terms and provisions, without resort to extrinsic evidence."[75]

---

[69]  *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006).

[70]  *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

[71]  *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[72]  *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017).

[73]  *Heartland Payment Sys., LLC v. Inteam Assocs., LLC*, 171 A.3d 544, 557 (Del. 2017) (internal quotation marks omitted).

[74]  *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018).

[75]  *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) (internal quotation marks omitted).

"Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it."[76]  Ambiguity exists only if disputed contract language is "fairly or reasonably susceptible to more than one meaning."[77] So a contract "is not ambiguous simply because the parties disagree on its meaning."[78]  "Even if the bargain they strike ends up a bad deal for one or both parties, the court's role is to enforce the agreement as written."[79]

As a question of law, a contract's proper interpretation can be resolved on a motion to dismiss.[80]  But, to achieve dismissal, the motion must be supported by unambiguous contract terms.[81]  At the pleadings stage of a contract dispute, the Court "cannot choose between two differing reasonable interpretations of ambiguous" contract language.[82]  Rather, to succeed, the movant's interpretation

[76]  *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

[77]  *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[78]  *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997).

[79]  *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021).

[80]  *E.g.*, *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) ("Under Delaware law, the proper interpretation of language in a contract is a question of law. Accordingly, a motion to dismiss is a proper framework for determining the meaning of contract language.").

[81]  *E.g.*, *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 615 (Del. 2003); *see also GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012) ("[W]here two reasonable minds can differ as to the contract's meaning, a factual dispute results . . . .").

[82]  *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996); *see also Appriva*, 937 A.2d at 1292 ("Even if [the] Court consider[s] the

must be "the *only* reasonable construction as a matter of law."[83]  Otherwise, "for purposes of deciding" the motion, the language must be resolved in the non-movant's favor.[84]

### A. COUNT I STATES A CLAIM.

"To state a breach-of-contract claim, a claimant must allege: (1) the existence of a contractual obligation; (2) a breach of that obligation; and (3) damages resulting from the breach."[85]  Wielding various Separation Agreement provisions, Dow contends the Company pleads none of these elements because (1) the Code Violation is not covered by the Separation Agreement; (2) even if it were, the Company failed to provide Dow with "prompt" and "reasonabl[y] detail[ed]" notice of it; and (3) the damages the Company seeks are non-existent or have been contractually disclaimed. But, as explained below, the Company's well-pleaded allegations and the Separation Agreement's language undermine Dow's bid for dismissal.  The Company has stated a reasonably conceivable breach-of-contract claim.

---

[movant's] interpretation more reasonable than the [non-movant's], on a Rule 12(b)(6) motion it [is] error to select the 'more reasonable' interpretation as legally controlling.").

[83]   *VLIW Tech.*, 840 A.2d at 615.

[84]   *Id.*; *see also Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *8 (Del. Ch. Sept. 18, 2014) ("At the motion to dismiss stage, ambiguous contract provisions must be interpreted most favorably to the non-moving party.").

[85]   *Intermec IP Corp. v. TransCore, LP*, 2021 WL 3620435, at *10 (Del. Super. Ct. Aug. 16, 2021) (internal quotation marks omitted).

**1. The Code Violation Is Covered Unless It Is Later Found Excluded.**

Before the transaction closed, Dow partitioned the land surrounding the Building. After the transaction closed, the Company was denied a permit to expand the Building because German authorities, citing a specific property regime, determined the Building was reconfigured in a way that violated positive zoning law. To realign the Building with the law, the Company retained counsel, for investigation and defense, and architects, for charting a reconstruction plan. Having consulted those groups, as well as the German government, the Company concluded it must reposition or demolish at least one structure on the Stade site and obtain two easements from Dow. Dow acknowledged all this in its replies to the Company's Notices, granting the two easements along the way. Taken together, these allegations support the reasonable inference that the Code Violation exists, and more important, that it existed before Dow sold the Building to the Buy-Side.

The Code Violation is reasonably conceivable. So the Court next must determine whether the Code Violation conceivably triggers Dow's duty to indemnify (i) an Excluded (ii) Liability that has caused the Company (iii) to "actually suffer[] or incur[]" (iv) Loss. It does.

To begin, Dow does not dispute the Code Violation's "Excluded" status. Nor could it. A Liability is Excluded—that is, eligible for coverage—if it attached to a

Transferred Asset before the Distribution Date, *i.e.*, October 5, 2015.[86] Here, the complaint alleges that Dow's partition registered in February 2015. That means the Code Violation occurred eight months before the Distribution Date. Accordingly, it plainly meets the "Excluded" part of the Excluded Liability definition.

Closing the circle, the Code Violation also is a Liability. A Liability is defined to include, for example, "any and all . . . liabilities . . . whether . . . known or . . . determined . . . arising under any Law."[87] As explained, the Code Violation is reasonably conceivable. At this stage, that makes it a "known or . . . determined" "liabilit[y]"—*i.e.*, a concrete exposure to legal accountability.[88] Too, the Code Violation plainly "aris[es] under" a Law. In the indemnification context, "arising under" has been defined, among other ways, as "originat[es] from."[89] Applying that definition, the Code Violation unambiguously arises under a "foreign . . . or local

---

[86] SA § 1 (Definitions).

[87] *Id.*

[88] *See Liability*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[89] *Sycamore Partners Mgmt., L.P. v. Endurance Am. Ins. Co.*, 2021 WL 4130631, at *12 (Del. Super. Ct. Sept. 10, 2021) ("*Sycamore II*") (quoting *Pac. Ins. Co. v. Liberty Mut. Ins. Co.*, 956 A.2d 1246, 1256 n.42 (Del. 2008)); *see Goggin v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 2018 WL 6266195, at *4 (Del. Super. Ct. Nov. 30, 2018) ("'Arising out of' is a term that 'lends itself to uncomplicated, common understanding . . . .' [I]t means 'incident to, or having a connection with.'" (citations omitted) (first quoting *Eon Labs Mfg., Inc. v. Reliance Ins. Co.*, 756 A.2d 889, 893 (Del. 2000); then quoting *Pac. Ins. Co.*, 956 A.2d at 1256 & n.42)); *see also Arise*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("To originate; to stem (from).").

statute . . . ordinance, regulation, . . . code, order, [or] requirement"—*i.e.*, the German property code.[90]  Accordingly, the Code Violation is an (Excluded) Liability.

Last, the Code Violation must cause the Company to "actually suffer[] or incur[]" "Loss."[91]  Because the Code Violation plainly is an Excluded Liability, its costs— even if "unaccrued, . . . variable, . . . unknown, . . . contingent, . . . unmatured . . . or determinable"—necessarily are defined Losses.[92]  The Separation Agreement, though, does not define "suffer[]" or "incur[]."  But dictionaries do.  And "[u]nder well-settled law," the Court may use the dictionary to define generic terms.[93]

Take "suffer."  Dictionaries define "suffer" as "to experience or sustain . . . injury," including "damages."[94]  In turn, dictionaries define "injury" to include "pecuniary injury," which is "any harm" "that can be adequately measured or compensated by money."[95]  The Company alleges the Code Violation requires for

---

[90]  SA § 1 (Definitions); Compl. ¶ 12.

[91]  *Id.* § 1 (Definitions), 4.02 (Indemnification by Dow).

[92]  *Id.* § 1 (Definitions).

[93]  *Lorillard Tobacco*, 903 A.2d at 728; *see Norton v. K–Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013) ("We give words their plain meaning unless it appears the parties intended a special meaning."); *cf. Penton Bus. Media Holdings, LLC v. Informa PLC*, 252 A.3d 445, 461 (Del. Ch. 2018) ("When established legal terminology is used in a legal instrument, a court will presume that the parties intended to use the established legal meaning of the terms."); *Viking Pump, Inc. v. Liberty Mut. Ins. Co.*, 2007 WL 1207107, at *13 (Del. Ch. Apr. 2, 2007) ("[W]here a word has attained the status of a term of art and is used in a technical context, the technical meaning is preferred over the common or ordinary meaning.").

[94]  *Suffer*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[95]  *Injury*, in *id.*; *Pecuniary Injury*, in *id.*

its clearance third-party expertise, including from attorneys and architects. They don't work for free. Their retainers, then, are pecuniary injuries that would not have been "experience[d]" or "sustain[ed]" without the Code Violation.[96] Accordingly, the Code Violation has caused the Company to suffer Loss. Having passed all parts of the Separation Agreement's indemnity test, the Code Violation is indemnifiable.

Dow's contrary arguments train myopically on the word "incur."[97] But, as a disjunctive "or" separates "suffer" and "incur," proof of either is sufficient.[98] Indeed, dictionaries define "incur" tautologically to mean "to suffer . . . a liability or expense."[99] So, because the Code Violation's costs have been suffered, they also have been incurred.[100] As a result, Dow's principal argument—*i.e.*, that "future" costs cannot be "actually . . . incurred"—is unsupported by the terms it drafted.[101]

---

[96]   *Suffer*, in *id.*

[97]   Dow Br. at 11–13.

[98]   *See, e.g.*, *Indian Harbor Ins. Co. v. SharkNinja Operating, LLC*, 2020 WL 6795965, at *4 (Del. Super. Ct. Nov. 19, 2020) (declining to consider parties' arguments to the extent the arguments focused on contract terms separated by a disjunctive "or" after concluding one term was sufficient).

[99]   *Incur*, BLACK'S LAW DICTIONARY (11th ed. 2019); *accord Horton v. Organogenesis Inc.*, 2019 WL 3284737, at *4 (Del. Ch. July 22, 2019).

[100]   Interpreting two terms redundantly is unproblematic where, as here, doing so plainly reflects the parties' mutual intent to ensure with "belt-and-suspenders" a contractual outcome will be guaranteed. *E.g.*, *Sycamore II*, 2021 WL 4130631, at *12 n.98 (discussing circumstances under which redundant interpretations are permissible and collecting authority); *see U.S. W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *15 (Del. Ch. June 6, 1996) ("While redundancy is sought to be avoided in interpreting contracts, this principle of construction does not go so far as to counsel the creation of contract meaning for which there is little or no support in order to avoid redundancy.").

[101]   *Compare* Dow Br. at 12, *with* SA §§ 1 (Definitions), 4.02 (Indemnification by Dow).

In sum, the Code Violation is an Excluded Liability attributable to a Transferred Asset (the Building) that has caused the Company to suffer or incur Losses. By consequence, Dow must indemnify "any and all" of the Code Violation's costs. Dow, though, allegedly has refused to pay those costs. Accordingly, Dow is in breach unless other terms in the Separation Agreement relieve it of its coverage duties. Recognizing this, Dow deploys the Transferred Asset Disclaimer, the Notice Provision, and the Damages Disclaimer. None supports dismissal.

### 2. The Transferred Asset Disclaimer is Ambiguous.

Dow first advances the Transferred Asset Disclaimer. That exclusion is divided into two parts: a declaration and an exception. Through the declaration, the parties acknowledged Dow had conveyed to the Company "all" Transferred Assets on an "as is" and "where is" basis, regardless of whether a particular Asset is "in violation of any Law" or cannot "obtain any necessary consents or approvals of any . . . governmental authorities."[102] And through the exception, the parties agreed the Disclaimer does not apply to the extent it is inconsistent with a provision in either the Separation *or* Merger Agreement.[103] To no one's surprise, Dow focuses on the

---

[102] SA § 7.01.

[103] *Id.* (excluding coverage "except as set forth in any Transaction Document"). The concept that two agreements comprising the same transaction must be interpreted together is well-received. *E.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (AM L. INST. 1981); *accord Trexler v. Billingsley*, 2017 WL 2665059, at *4 n.21 (Del. June 21, 2017).

declaration[104] and the Company presses the exception.[105]

Dow contends the Disclaimer reflects bilateral loss-shifting. According to Dow, the Disclaimer plainly excludes the Code Violation because it derives from a Transferred Asset that was sold to the Company "where is." In Dow's view, the Company assumed the risk the Building would be in violation of a Law or shunned from government imprimatur and so the Company cannot now complain just because those possibilities materialized. Failure to enforce the Disclaimer this way, Dow asserts, would render it superfluous and allow the Company's "general" exception to swallow the "specific" rule.[106] Dow's reading is reasonable.

But the Company responds with a reasonable read of its own. The Company posits the Disclaimer's exception would be meaningless if the Disclaimer's declaration swept as broadly as Dow suggests. That is so, to the Company, because Dow's Disclaimer would preclude coverage for "any and all" Excluded Liability Losses—despite express language requiring their coverage—and nullify contrary representations Dow seems to have made in the Merger Agreement about the Building's compliance with Law.[107] The Company accordingly reasons the

---

[104] Dow Br. at 10–11; Def.'s Reply Br. in Supp. of Mot. to Dismiss at 3–9 (D.I. 11) ("Dow Reply Br.").

[105] BC Br. at 11–15.

[106] *See generally DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).

[107] *E.g.*, MA § 4.10.

Disclaimer's exception "subordinates" the declaration in a way that carves Losses like those generated by the Code Violation out from exclusion.[108]

Both parties have proposed incomplete, but reasonable, interpretations of the Transferred Asset Disclaimer. At this stage, however, the Court can't choose the one it likes better.[109] Instead, the Court must deny Dow's motion so the parties can take discovery on their mutual intent in wording the Transferred Asset Disclaimer.

**3. The Notice Provision Is Not a Condition Precedent to Coverage.**

In a second attempt to ward off its coverage duties, Dow incants the Notice Provision. Notwithstanding its active engagement with the Company's Notices, Dow now says it has no duty to indemnify the Code Violation because the Company failed to provide Dow with "prompt" and "reasonabl[y] detail[ed]" notice of it. In essence, then, Dow is arguing the Notice Provision is a condition precedent to coverage. It isn't.

The existence of a condition precedent is a question of contract interpretation, and therefore, of law.[110] "A condition precedent is an act or event, other than a lapse

---

[108] *See generally Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 2000 WL 1476663, at *9 n.23 (Del. Ch. Sept. 27, 2000).

[109] *Vanderbilt Income*, 691 A.2d at 613; *see Appriva*, 937 A.2d at 1292 ("Even if the Superior Court considered the defendants' interpretation more reasonable than the plaintiffs', on a Rule 12(b)(6) motion it was error to select the 'more reasonable' interpretation as legally controlling."); *see also CLP Toxicology, Inc. v. Casla Bio Holdings, LLC,* 2021 WL 2588905, at *12 (Del. Ch. June 14, 2021) ("[O]n a motion to dismiss, the Court can't just choose between two differing reasonable interpretations of . . . ambiguous language.").

[110] *E.g., Casey Emp. Servs., Inc. v. Dali*, 1993 WL 478088, at *4 (Del. Nov. 18, 1993).

of time, that must exist or occur *before* a duty to perform something arises."[111] "Under Delaware law, conditions precedent are not favored . . . because of their tendency to work a forfeiture."[112] Given that tendency, "a condition precedent must be expressed clearly and unambiguously."[113] "For a condition to effect a forfeiture, it must be unambiguous. If the language does not clearly provide for a forfeiture, then a court will construe the agreement to avoid causing one."[114]

The Notice Provision does not clearly express a condition precedent. Most notably, the Provision does not tie to its mandatory notice procedures any consequences for failing to lodge an indemnification notice properly. When a provision guised by a party as a condition precedent does not identify the way in which it can be enforced, it will not be recognized as a condition precedent.[115] That is especially so where, as here, interpreting the provision as a condition precedent would cause a total forfeiture of a sophisticated indemnification scheme executed in

---

[111] *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *25 (Del. Super. Ct. July 29, 2021) (internal quotation marks omitted); *see* RESTATEMENT (SECOND) OF CONTRACTS § 224.

[112] *Thomas v. Headlands Tech Principal Holdings, L.P.*, 2020 WL 5946962, at *5 (Del. Super. Ct. Sept. 22, 2020) (alteration and internal quotation marks omitted).

[113] *Aveanna Healthcare*, 2021 WL 3235739, at *25.

[114] *QC Holdings, Inc. v. Allconnect, Inc.*, 2018 WL 4091721, at *7 (Del. Ch. Aug. 28, 2018) (internal quotation marks and citation omitted).

[115] *See Eurofins Panlabs, Inc. v. Ricerca Bioscis., Inc.*, 2014 WL 2457515, at *3–4 & n.21 (Del. Ch. May 30, 2014).

connection with an acquisition of various chemically-sensitive and intellectual properties, and that would expose the buyer to an array of environmental liabilities.[116]

Even so, the No Waiver Provision confirms that failure to satisfy the Notice Provision does not relieve Dow of its indemnification duties. "Generally, no waiver provisions give a contracting party some assurance that its failure to . . . strict[ly] adhere[] to a contract term . . . will not result in a complete and unintended loss of its contract rights if [a party] later decides strict performance is desirable."[117] So a no waiver provision "protects the waiving party by stating [its] individual waivers shall not operate" to "permanently" waive the right to which it otherwise is entitled.[118]

The No Waiver Provision does just that. Under the No Waiver Provision, the parties agreed any "delay" by the Company in exercising its "right" to indemnification would not "operate as a waiver" of its "right" to indemnification

---

[116] *See, e.g.*, SA § 4.09 (Environmental Liabilities); *see also QC Holdings*, 2018 WL 4091721, at *6–7 (rejecting as "commercially irrational" a condition argument that, if accepted, would have deprived a counterparty of a multi-million dollar option when the subject contract was "silent" on whether the subject provision was a condition).

[117] *Rehoboth Mall Ltd. P'ship v. NPC Int'l, Inc.*, 953 A.2d 702, 704 (Del. 2008) (second omission in original) (internal quotation marks omitted).

[118] *Id.* at 704–05; *see, e.g.*, *Aveanna Healthcare*, 2021 WL 3235739, at *30 (rejecting waiver argument based on a notice provision because the parties' agreement contained a no waiver provision and distinguishing precedent in which a waiver was found but also in which the subject agreement did not contain a no waiver provision).

-29-

should Dow, as it in fact did, later decide a notice is deficient.[119]  Accordingly, viewed in the context of the entire Separation Agreement,[120] the parties plainly did not intend for the Notice Provision to be a condition precedent to coverage.

To the extent Dow is arguing the Notice Provision imposes a standalone duty on the Company that it breached by providing its Notices five years post-closing,[121] its theory would not support dismissal.  The proper vehicle for launching a counterclaim or raising a defense for the first time is an answer, not a pre-answer motion.  Dow might pursue a whole or partial setoff as this case proceeds.  For now, though, Dow's counterclaims or defenses aren't in the case.  So the Court won't

---

[119] SA § 8.09.  Also, in the Notice Provision itself, there is a provision that states an untimely notice does not relieve Dow of its coverage duties unless the delay is prejudicial.  *Id.* § 4.06(b). The Company, however, has been proceeding, without explanation, as if only Section 4.06(a) applies.  Section 4.06(a), though, does not contain the same statement and prejudice exception. *See id.* § 4.06(a).  When asked about Section 4.06(b)'s role, the Company responded elliptically, suggesting 4.06(b) is limited to its terms, but that its prejudice component can be imported into Section 4.06(a).  Hr'g Tr. at 35–36.  Given that the Company (and Dow) has not illuminated Section 4.06(b) to the Court's satisfaction, the Court does not rely on it here.

[120] *See, e.g.*, *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998) ("[A] court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument."); *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) ("[T]he meaning [that] arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan."); *see also Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992) ("Under general principles of contract law, a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless.").

[121] Hr'g Tr. at 21.

consider them any further.[122]

The Notice Provision isn't a condition precedent.[123]

**4. The Damages Disclaimer Does Not Support Dismissal.**

In a last gasp, Dow invokes the Damages Disclaimer. This Disclaimer precludes the Company from obtaining "indirect damages," including "lost profits" and "business opportunity" losses.[124] Seizing on a phalanx of cherry-picked allegations, Dow contends, because some parts of the Company's damages seem premised on "business interruption[s]" and economic harm flowing consequentially from the Code Violation, the Company has not, to that extent, pleaded recoverable direct damages.[125] Dow's arguments fail.

As an initial matter, Dow's attempt to dismiss "parts" of the Company's damages allegations runs contrary to black-letter procedural law. Under Delaware

---

[122] In any event, courts do not typically consider affirmative defenses on a motion to dismiss. *See, e.g.*, *Reid v. Spazio*, 970 A.2d 176, 183–84 (Del. 2004) ("In ruling on a motion to dismiss[,] . . . the Court is generally limited to facts appearing on the face of the pleadings. Accordingly, affirmative defenses . . . are not ordinarily well-suited for treatment on a motion to dismiss. Unless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it, dismissal of the complaint based upon an affirmative defense is inappropriate." (citations omitted)); *accord Cedarview Opportunities Master Fund, L.P. v. Spanish Broad. Sys., Inc.*, 2018 WL 4057012, at *13 (Del. Ch. Aug. 27, 2018).

[123] And in light of that, the Court need not yet decide whether the Company's notice was, in fact, prompt and reasonably detailed.

[124] SA § 7.02.

[125] *E.g.*, Dow Br. at 16; Dow Reply Br. at 17–18; Hr'g Tr. at 19–20.

law, "a motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims."[126] Instead, a movant must seek dismissal of an entire claim for its motion to be deemed procedurally valid.[127] Dow's improper effort to "trim down" Count I is, therefore, dispositive of its motion on that count.[128]

That aside, courts, at the pleadings stage, decline invitations to categorize damages.[129] And their rejections are even more forceful where, as here, the movant frames its request in the distinction between direct[130] and indirect[131] damages.[132]

---

[126] *inVentiv Health Clinical, LLC v. Odonate Therapeutics, Inc.*, 2021 WL 252823, at *6 (Del. Super. Ct. Jan. 26, 2021) (alteration and internal quotation marks omitted).

[127] *See id.* ("Put simply, the Court must consider a claim or counterclaim [in] its entirety when ruling on a Rule 12(b)(6) motion to dismiss.").

[128] *Id.*

[129] *See, e.g.*, *Horton*, 2019 WL 3284737, at *4 ("At the pleadings stage, allegations regarding damages can be pled generally." (alteration and internal quotation marks omitted)).

[130] *See generally WSFS Fin. Corp. v. Great Am. Ins. Co.*, 2019 WL 2323839, at *4 (Del. Super. Ct. May 31, 2019) ("Direct damages are those inherent in the breach. [They] are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong.").

[131] *See generally id.* at *5 ("Consequential damages . . . are those that result naturally but not necessarily from the wrongful act, because they require the existence of some other contract or relationship. [They] are not recoverable unless they are foreseeable and are traceable to the wrongful act and result from it." (citation omitted)); *Mass. Mut. Life. Ins. Co. v. Certain Underwriters at Lloyd's of London*, 2010 WL 2929552, at *21 (Del. Ch. July 23, 2010) ("Consequential damages are those [that] are reasonably foreseeable, but [that] do not result directly from the act of a party." (internal quotation marks omitted)).

[132] *E.g.*, *Pharm. Prod. Dev., Inc. v. TVM Life Sci. Ventures VI, L.P.*, 2011 WL 549163, at *7 (Del. Ch. Feb. 16, 2011) ("[T]he distinction between general and [consequential] damages is a contextual one [that] takes on added importance at the pleadings stage where all that is required of the plaintiff is that she give notice to the defendant of the nature of the claims against him and the relief she seeks.").

Indeed, "courts have had difficulty establishing a workable distinction between direct and consequential damages, and the results vary with the facts."[133] Given that, the relevant question at the pleadings stage of a contract dispute is not whether a particular species of damages alleged can be cataloged with scientific precision, but rather, whether the plaintiff made a "short and plain statement" of a conceivable injury that might be measured in cash by a fact-finder.[134]

The Company did. Though Dow ignores and, at times, might be said to mischaracterize, the complaint,[135] the Company has alleged actual damages incurred in retaining legal and engineering professionals for remedying the Code Violation.[136] Whether those damages are direct or indirect will be revealed as the case proceeds.[137] "A contractual restriction on consequential damages," like the Damages Disclaimer,

---

[133] *Bonanza Rest. Co. v. Wink*, 2012 WL 1415512, at *3 (Del. Super. Ct. Apr. 17, 2012); *see Twin Coach Co. v. Chance Vought Aircraft, Inc.*, 163 A.2d 278, 286 (Del. Super. Ct. 1960) (declining to resolve distinction between direct and consequential damages on a challenge to the pleadings— a task this Court found "virtually impossible" to do "as a matter of law").

[134] Del. Super. Ct. Civ. R. 8(a); *accord Alston v. Admin. Off. of the Cts.*, 2018 WL 1080606, at *1 (Del. Feb. 23, 2018) (describing Rule 8(a) as a "minimal threshold" designed to give "notice" and affirming dismissal because the underlying complaint "contained . . . no demand for relief").

[135] *Compare* Dow Br. at 16 (claiming the Company seeks damages for "an expansion project"), *with* Compl. ¶ 14 (mentioning an "expansion project" as a background fact).

[136] *E.g.*, Compl. ¶¶ 22–23.

[137] *See, e.g.*, *eCom. Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *47 (Del. Ch. Sept. 30, 2013) (explaining the circumstances under which lost profits might be direct, as opposed to consequential, damages); *see generally WSFS Fin.*, 2019 WL 2323839, at *4 ("The term 'actual damages' encompasses both 'direct' and 'consequential' damages.").

"standing alone, does not preclude recovery of . . . consequential damages."[138]

The Damages Disclaimer does not support dismissal. And neither does any other provision Dow has called up. Accordingly, its prayer to dismiss Count I is **DENIED**.

## B. COUNT II DOES NOT SURVIVE UNDER RULE 12(B)(6).

Finally, the Court turns to Count II. According to Dow, Count II—and, presumably, given its previous arguments, Count I—is unripe because the Company alleges speculative relief. As support for this contention, Dow excerpts from the complaint instances in which the Company uses the future tense to describe some of its damages.[139] Using its understanding of the Company's proposed recovery, Dow concludes a declaratory judgment would be improper because there is no controversy supporting one yet. Dow is wrong about ripeness, but right about Count II's fitness.

### 1. Count II Is Ripe.

The Court's power to issue a declaratory judgment derives from the Declaratory Judgment Act (the "DJA").[140] A declaratory judgment "is designed to

---

[138] *Bonanza Rest.*, 2012 WL 1415512, at *3 (citing *Rexnord Corp. v. DeWolff Boberg & Assocs., Inc.*, 286 F.3d 1001, 1004 (7th Cir. 2002)).

[139] *E.g.*, Compl. ¶¶ 28, 39(a) & Prayer § (a).

[140] DEL. CODE ANN. tit. 10, ch. 65 (2020).

promote preventative justice."[141]  It is "[b]orn out of practical concerns,"[142] affording efficient relief where a traditional remedy is otherwise unavailable.[143]  To that end, the DJA may be engaged to assuage "uncertainty and insecurity with respect to rights, status and other legal relations."[144]

"Not all disputes, however, are appropriate for judicial review when the parties request it."[145]  A declaratory judgment action presupposes a still-evolving controversy, imposing jurisdictional limitations.[146]  And Delaware "law requires that a dispute . . . be ripe for adjudication," *i.e.*, involve an actual controversy, before a party may seek a declaration.[147]  Pronouncing a declaration before the facts have ripened "not only increases the risk of an incorrect judgment in the particular case,

---

[141] *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1237–38 (Del. Ch. 1987) (quoting *Stabler v. Ramsey*, 88 A.2d 546, 557 (Del. 1952)).

[142] *Id.* at 1238.

[143] *See id.* ("The notion laying behind [declaratory judgments] is that legitimate legal interests are sometimes cast into doubt by the assertion of adverse claims and that, when this occurs, a party who suffers practical consequences ought not to be required to wait upon his adversary for a judicial resolution that will settle the matter.").

[144] DEL. CODE ANN. tit. 10, § 6512.

[145] *Town of Cheswold*, 188 A.3d at 816.

[146] *E.g.*, *Schick*, 533 A.2d at 1238–39 ("A number of important concerns have led courts . . . to decline [declaratory judgment] jurisdiction in instances in which a controversy is deemed to have not yet matured to a point at which judicial action is appropriate.").

[147] *Crescent/Mach I Partners, L.P. v. Dr Pepper Bottling Co. of Tex.*, 962 A.2d 205, 208 (Del. 2008).

but risks, as well, an inappropriate or unnecessary step in the incremental law building process itself."[148]

"A case is ripe for judicial review when the dispute has matured to the point where the [claimant] has suffered or will imminently suffer an injury."[149] In other words, a case "will be deemed ripe if litigation sooner or later appears to be unavoidable and where the material facts are static."[150] In contrast, "[a] dispute will be deemed not ripe where the claim is based on uncertain and contingent events that may not occur, or where future events may obviate the need for judicial intervention."[151] Ascertaining the difference "involves interest balancing, weighing 'the interests of the court . . . in postponing judicial review until the question arises in some more concrete and final form' against 'the interests of those who seek relief from the challenged action's immediate and practical impact upon them.'"[152]

---

[148] *Schick*, 533 A.2d at 1239; *accord Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989);.*see also XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1217 (Del. 2014) ("The underlying purpose of the [ripeness] principle is to conserve limited judicial resources and to avoid rendering a legally binding decision that could result in premature and possibly unsound lawmaking." (citing *Stroud*, 552 A.2d at 480)).

[149] *Town of Cheswold*, 188 A.3d at 816.

[150] *XL Specialty*, 93 A.3d at 1217.

[151] *Id.* at 1217–18 (internal quotation marks and citation omitted).

[152] *Goldenberg v. Immunomedics, Inc.*, 2021 WL 1529806, at \*19 (Del. Ch. Apr. 19, 2021) (quoting *Schick*, 533 A.2d at 1239).

Regardless of the Company's grammar, the Court already has concluded its damages—and the facts giving rise to them—are ripe. By alleging consultation and reconstruction costs suffered from a reasonably conceivable breach-of-contract, the Company has pleaded matured relief that it will put a number on at some point. After all, at the pleadings stage, damages need not be conclusively calculated. In some sense, all complained-of damages are "speculative" until the true amount emerges in discovery and ultimately is set at trial. So that's no reason to dismiss.

More important, the Separation Agreement, by definition, permits recovery of future damages. As observed, the Separation Agreement makes indemnifiable "any and all" Excluded Liabilities, "whether accrued or unaccrued, fixed or variable, known or unknown, absolute or contingent, matured or unmatured or determined or determinable."[153] That language distinguishes this case from other cases that found abstract or unidentified damages insufficient to support a claim.[154] In a word, Dow

---

[153] SA § 1 (Definitions).

[154] *See, e.g.*, *Goldenberg*, 2021 WL 1529806, at *20 (dismissing claim to a royalty payment as unripe where the court found "[i]t possible that the [c]ompany may never generate royalties" and had no contractual obligation to do so); *Wunderlich v. B. Riley Fin., Inc.*, 2021 WL 1118006, at *4 (Del. Ch. Mar. 24, 2021) (dismissing indemnification claim as unripe because the underlying liability "had not been asserted," and there were no liabilities accruing otherwise); *B/E Aerospace, Inc. v. J.A. Reinhardt Holdings, LLC*, 2020 WL 4195762, at *5 (Del. Super. Ct. July 21, 2020) (dismissing claim involving exhaustion of funds escrowed for indemnification where it could take "until the 2040s to exhaust" the funds); *Horton*, 2019 WL 3284737, at *4 (dismissing indemnification claim as unripe because claimant had not yet incurred any damages from an impending litigation); *Hill v. LW Buyer, LLC*, 2019 WL 3492165, at *9 (Del. Ch. July 31, 2019) (dismissing indemnification claim based on future taxes as unripe where the payors "ha[d] yet to pay or be assessed any taxes that may fall under" the claim).

signed up for this.[155]  And it is not the Court's job to reallocate risk Dow voluntarily accepted.[156]

## 2. But, Count II Is Impermissibly Duplicative of Count I.

Count II is ripe for the same reasons Count I is ripe.  But therein lies a problem: Count I and Count II really are the same claims.  As a result, though Count II technically is ripe, it reproduces the same core elements of, and so rises or falls with, Count I.  That means a decision on Count I would moot[157] Count II, revealing the latter as a duplicate.  This unnecessary (and perhaps even harmful[158]) two-for-

---

[155] *See NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd*, 2008 WL 571543 (Del. Mar. 4, 2008).

[156] *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 624 (Del. Ch. 2005) ("The proper way to allocate risks in a contract is through the bargaining process.  It is not the court's role to rewrite the contract between sophisticated market participants, allocating the risk of an agreement after the fact . . . ."), *rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006); *see W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007) ("The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arms-length negotiations."), *aff'd*, 2009 WL 4154356 (Del. Nov. 24, 2009); *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006) ("[I]t is not the job of a [Delaware] court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not.").

[157] Mootness raises a question of subject matter jurisdiction.  *E.g.*, *B/E Aerospace*, 2020 WL 4195762, at *2 (summarizing applicable authority).  As a result, the Court may investigate a potentially-moot claim *sua sponte*.  *E.g.*, *KT4 Partners*, 2021 WL 2823567, at *24 ("[T]he Court may question its own subject matter jurisdiction *sua sponte* at any time.  The Court is independently obligated to ensure that it has jurisdiction over the parties' claims *if any doubt exists*." (omission and internal quotation marks omitted)).

[158] *See* n.163, *infra*.

one, Delaware law, does not allow.

A declaratory judgment "is a statutory action" and so "is meant to provide relief in situations where a claim is ripe but would not support an action under common-law pleading rules."[159] It follows, then, that there is no need for a declaratory judgment where a claimant does have recourse to the common law.[160] Put differently, where a claimant merely has repackaged in the language of a declaration an adequately-pleaded affirmative count, the "declaration" is duplicative and not viable.[161] Indeed, a duplicative declaration "does not add anything"[162] but, instead, counteracts the efficiency-based rationale animating declaratory judgment

---

[159] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *29 (Del. Ch. Nov. 16, 2014) (citation omitted).

[160] *Cf. Schick*, 533 A.2d at 1238 ("The notion laying behind [declaratory judgments] is that legitimate legal interests are sometimes cast into doubt by the assertion of adverse claims and that, when this occurs, a party who suffers practical consequences ought not to be required to wait upon his adversary for a judicial resolution that will settle the matter.").

[161] *See, e.g.*, *Trusa v. Nepo*, 2017 WL 1379594, at *8 n.71 (Del. Ch. Apr. 13, 2017) (dismissing a declaratory count as duplicative because it rested on "the necessary determinations the Court would make in resolving" the complaint's affirmative counts); *see US Ecology, Inc. v. Allstate Power Vac, Inc.*, 2018 WL 3025418, at *10 (Del. Ch. June 18, 2018) (same), *aff'd*, 2019 WL 24460 (Del. Jan. 17, 2019); *Great Hill*, 2014 WL 6703980, at *29 (same); *Veloric*, 2014 WL 4639217, *20 (same); *cf. Sweetwater Point, LLC v. Kee*, 2020 WL 6561567, at *12 (Del. Super. Ct. Nov. 5, 2020) ("Where a declaratory judgment does not set forth a distinct cause of action and the other claims fail, the declaratory judgment claim must fail.").

[162] *ESG Cap. Partners II, LP v. Passport Special Opportunities Master Fund, LP*, 2015 WL 9060982, at *15 (Del. Ch. Dec. 16, 2015); *cf.* DEL. CODE ANN. tit. 10, § 6508 (authorizing courts to provide "supplemental relief" on a cognizable declaration "whenever necessary and proper").

jurisdiction.[163]  Accordingly, to survive dismissal, a declaratory count must be "distinct" from the affirmative counts in the complaint[164] such that a decision on the affirmative counts would not resolve the declaratory count.[165]

Count II just isn't sufficiently distinct from Count I.  Through Count II, the Company seeks a declaration that Dow is liable for "any and all Losses" incurred from the Code Violation.  But, in Count I, the Company seeks the same thing, except in the language of breach.  Indeed, the Company defended Count II as "guardrails" that ensure "losses, *the defined term*, are indemnified here."[166]  Count I serves that very purpose.

---

[163] *E.g.*, *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at \*15 (Del. Super. Ct. Jan. 31, 2019) (observing, in the declaratory judgment context, that "the prospective of duplicative efforts . . . are contrary to the notion of judicial economy and the need to conserve the Court's resources"); *see also Burris*, 583 A.2d at 1372 n.6 ("[I]f a practical evaluation of the peculiar facts and circumstances of the case lead the Court to believe . . . a declaratory action will [not] serve a practical and useful purpose[,]" the declaratory action should be dismissed.).

What's more, in certain cases, such duplication has the potential for visiting far greater mischief than any potential good.  Here, for instance, the Court notes—though the Company tries mightily to suggest otherwise—the nature and language of the supplemental declaration sought would really amount to a judicially-scrivened "blank check" to cover *any* future expenditures the Company *might* divine or categorize as attributable to the Code Violation.  Hr'g Tr. at 31–33.

[164] *Sweetwater*, 2020 WL 6561567, at \*12, \*17; *Trusa*, 2017 WL 1379594, at \*8 n.71; *Veloric*, 2014 WL 4639217, \*20.

[165] *See, e.g.*, *Goldenberg*, 2021 WL 1529806, at \*20 (reasoning that, where a decision *sub judice* establishes, or creates law of the case capable of establishing, the right the claimant has sought through a declaration, the declaration request is moot because relief has been or will be afforded affirmatively).

[166] Hr'g Tr. at 33 (emphasis added).

-40-

A successful breach-of-contract claim would afford the Company "any and all" coverage it proves—there would be nothing more to declare.[167]  And an unsuccessful breach-of-contract claim would defeat the declaration—there could be no required indemnification.[168]  Because the declaration is premised on the same interpretative outcome, it is duplicative.[169]  Given the Separation Agreement's broad "any and all" language, the Company's desired contract remedy would be enough.[170]

Against this result stands *Cooper Industries, LLC v. CBS Corp.*[171]  There, a declaratory judgment request survived dismissal alongside a breach-of-contract claim, even though both arguably addressed the same injury.  But, despite its similar facts, *Cooper Industries* did not consider anti-duplication law, which the decision could be read to otherwise contradict.

In *Cooper Industries*, a buyer and a seller executed an asset purchase

---

[167] *But see ESG Cap.*, 2015 WL 9060982, at *15.

[168] *But see Goldenberg*, 2021 WL 1529806, at *20.

[169] *Trusa*, 2017 WL 1379594, at *8 n.71.

[170] *See, e.g.*, *Great Hill*, 2014 WL 6703980, at *29 ("Declaratory judgment . . . is meant to provide relief where a claim . . . would not support a cause of action . . . . Here, however, Plaintiffs assert a complete entitlement to a complete set of common-law and equitable remedies, in contract, tort and equity, including recission of the contract.  Because the declaratory judgment count is completely duplicative of the affirmative counts of the complaint, [it] is dismissed." (citations omitted)).

[171] 2019 WL 245819 (Del. Super. Ct. Jan. 10, 2019).  The parties did not cite this decision, but it reaches the opposite result on seemingly analogous facts.  So, the Court addresses it for the sake of candor and completeness.

agreement through which the buyer acquired a manufacturing facility from the seller.[172] The manufacturing facility produced hazardous waste.[173] So the buyer extracted a broad indemnification duty from the seller under which the seller agreed to indemnify "all" contamination-related losses.[174] The plaintiff, as successor to the buyer, and the defendant, as successor to the seller, inherited this arrangement.[175]

Decades later, regulators discovered contamination at the facility.[176] To avoid pollution penalties, the plaintiff undertook cleanup efforts at its own expense.[177] Seeking reimbursement, the plaintiff noticed the defendant of its duty to indemnify "all" contamination costs.[178] But the defendant refused coverage. Dissatisfied, the plaintiff sued for breach-of-contract and declaratory judgment. The defendant moved to dismiss, arguing (i) the statute of limitations barred the plaintiff's breach-of-contract count; and (ii) the declaratory count was impermissibly duplicative of the breach-of-contract count.[179]

---

[172] *Id.* at *1.

[173] *Id.* at *1–2.

[174] *Id.* at *1.

[175] *Id.*

[176] *Id.* at *2.

[177] *Id.*

[178] *Id.* at *3.

[179] *Id.*

Having found the breach claim timely,[180] the *Cooper Industries* court then spoke to the defendant's duplication argument. The defendant argued the declaratory count was "superfluous" and "simply recast[ed]" the plaintiff's breach allegations.[181] The Court disagreed. In the Court's view, the two counts were "entirely different" because they involved separate "interpretation issues."[182] As support for that finding, the Court found grounding for its case-specific ruling in the plaintiff's counterarguments:

> Cooper argues that its declaratory judgment claim "is intended to resolve a dispute that CBS raised regarding the interpretation of Section 14.5." Plaintiff believes that its two claims are distinct because the "breach claim seeks damages for CBS's violation of its duty to indemnify Cooper, and the declaratory judgment claim seeks a determination that CBS had a duty to indemnify and seeks a resolution of the interpretive dispute CBS has raised regarding the scope of CBS's indemnity obligation under Section 14.5."[183]

Determining that it did not, at this point, need to resort to any additional authority or further interpret the parties' agreement, the Court found that ignoring the counts' "distinct[ions]" might just "open the door to future endless litigation between the parties."[184]

---

[180] *Id.* at *4.

[181] *Id.* at *5.

[182] *Id.*

[183] *Id.* (cleaned up).

[184] *Id.*

Given the specifics thereof—and what was not addressed therein—one need be wary of relying too heavily on *Cooper Industries* as some broad pronouncement that breach-of-contract and duplicative declaratory claims rest easily side-by-side.

The parties there gave little attention to the declaratory judgment count. And *Cooper Industries*, at bottom, was a statute of limitations case. So the parties' light touch, together with the case's posture, likely counseled against dismissing the proposed declaration until the parties developed the issue more helpfully.[185]

Here, though, there is no reason to defer. The Company doesn't need the additional "guardrails"[186] it attempts to erect. And so, Count II is **DISMISSED** as **MOOT**.

## IV. CONCLUSION

Count I survives dismissal. Under the Separation Agreement, the Code Violation is an indemnifiable (Excluded) Liability that has caused the Company to suffer Losses. Those Losses might be recovered as direct damages and will, regardless, be quantified eventually. Dow must cover "any and all" of those Losses unless another Separation Agreement provision relieves it of its coverage duties. At

---

[185] Given the statute of limitations question, the Court's dismissal ruling required a procedural approach. *See id.* at *3 ("The Court would like to note that, as [the parties] conceded in their respective briefs, Delaware procedural law will be applied." (citations omitted)). So the Court deferred substantive questions of "construction, validity and interpretation." *Id.* (internal quotation marks omitted); *see also id.* at *5 ("The Court also finds *at this stage of the litigation* that Plaintiffs' declaratory judgment claim is not duplicative . . . ." (emphasis added)).

[186] Hr'g Tr. at 33.

this stage, however, it is reasonably conceivable that none of the defensive provisions Dow has identified bars the Code Violation's coverage. Accordingly, Dow's motion against Count I is **DENIED**.

Count II, however, must be dismissed as moot. Where a claimant seeks both common law and declaratory relief for the same injury and on the same terms, the declaratory judgment claim is impermissibly duplicative unless it is pleaded as distinct from the common-law claim. Here, however, Count II has been pleaded merely as a declaratory version of Count I. It rests on the same facts, shoulders the same burden of proof, involves the same elements, and requests the same interpretive outcome. In short, Count II is unnecessary. Because the Court has found Count I conceivably provides all the relief the Company seeks, Dow's motion against Count II is **GRANTED**.

**IT IS SO ORDERED.**

_____
Paul R. Wallace, Judge